**UNITED STATES of America ex rel. Terry L. WILSON et al., Petitioners-Appellees,**

v.

**Joseph COUGHLIN, Assistant Director, Department of Corrections, Juvenile Division, Respondent-Appellant.**

**Nos. 72–1122–72–1129.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 19, 1972.

Decided Jan. 19, 1973.

Patrick T. Murphy, Lewis Wenzell, John D. Shullenberger and James M. DeZelar, Chicago, Ill., for the United States and Wilson.

William J. Scott, Atty. Gen., James B. Zagel, Asst. Atty. Gen., Chicago, Ill., for Coughlin.

Before STEVENS and SPRECHER, Circuit Judges, and GORDON, District Judge.[1]

STEVENS, Circuit Judge.

Four juveniles confined in the Illinois Industrial School for Boys at Sheridan, Illinois, filed petitions for habeas corpus alleging that they were entitled to be released because they have already received punishment greater than that authorized by law for adults guilty of offenses comparable to those which led to their respective delinquency findings. The district court denied the relief requested but ordered the respondent to transfer the four petitioners either to a home or to a different institution and to discontinue the use of the drug thorazine, or any other tranquilizer, for purposes of mere control or punishment. Both sides have appealed. Petitioners seek complete release from custody; respondent, without challenging the propriety of the relief which was granted, seeks a new trial on the ground that the district judge was biased.

## I.

In the district court, petitioners contended that they were denied equal protection of the laws by incarceration in an institution no different from an adult penitentiary for a longer period of time than they could have been incarcerated had they been convicted by the Illinois criminal courts. The district court found the facts in petitioners' favor and ordered respondent to provide them with the rehabilitative treatment authorized by the Illinois Juvenile Code;[2] he refused to order their release.

A juvenile delinquent may be incarcerated until his twenty-first birthday, no matter how insignificant the misconduct that resulted in the jurisdictional finding of delinquency, provided that the requisite findings are made at his dispositional hearing,[3] and provided further that he does not demonstrate that his best interests would be served by an earlier release.[4] Thus, a juvenile's indeterminate sentence may be longer than the maximum period of imprisonment for an adult guilty of a like offense. This potential difference in treatment does not invalidate the statutory distinction between adults and juveniles because offsetting benefits general-

---

1. Honorable Myron L. Gordon of the United States District Court for the Eastern District of Wisconsin is sitting by designation.

2. "The purpose of this Act is to secure for each minor subject hereto such care and guidance, preferably in his own home, as will serve the moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal; and, when the minor is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should be given by his parents, and in cases where

it should and can properly be done to place the minor in a family home so that he may become a member of the family by legal adoption or otherwise." Ill.Rev.Stat. Ch. 37, § 701–2(1).

3. "When any delinquent has been adjudged a ward of the court under the Act, the court may commit him to the Department of Corrections if it finds that (a) his parents, guardian or legal custodian are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor, or are unwilling to do so, and (b) the best interests of the minor and the public will not be served by placement under Section 5–7." Ill.Rev.Stat. Ch. 37, § 705–10 (1).

4. See Ill.Rev.Stat. Ch. 37, § 705–11.

ly result in favored treatment for the youthful offender.[5]

■ Since the character of petitioners' detention was tantamount to imprisonment in an adult penitentiary, they contend that they received no offsetting benefits which could arguably justify detention beyond that authorized for adults. Though not conclusive,[6] this argument is appealing; nevertheless, even if the argument is accepted for purposes of decision, it does not follow that the only permissible remedy is to treat petitioners as if they were adults. On the contrary, it was well within the district court's discretion merely to order respondent to provide them with the statutory benefits authorized for other members of the juvenile class. On the remedy issue the district court properly focused on the ultimate question of what relief would best serve the interests of these young men. Since we are satisfied that he did not abuse his discretion, we affirm the denial of petitioners' prayer for complete release without analyzing the validity of their equal protection claim.[7]

## II.

Although respondent prevailed on the principal issue litigated in the district court, and does not object to the relief granted against him, he urges us to order a new trial because the district judge was guilty of flagrant misconduct. The argument is in two parts: First, that a statement at a preliminary hearing evidenced prejudgment and required the judge to recuse himself; and second, that several incidents during the course of the trial revealed such bias and hostility on the part of the judge as to deprive respondent of a fair and impartial trial.

Since the propriety of the relief which was granted is not questioned no useful purpose would be served by another trial. We have concluded, however, that the record discloses such friction between the trial judge and counsel for respondent that if questions relating to compliance with the court's order should arise in the future, the interests of justice would be served by having such matters heard by another judge.

## A.

Respondent's motion to recuse was predicated on a statement made by the trial judge on Friday, October 15, 1971, in an informal opinion explaining his reasons for denying a motion to dismiss predicated on the assertion that state remedies had not been exhausted. Petitioners had invoked the state procedures, obtaining partial relief from the Juvenile Court in May, 1971, and had unsuccess-

5. See Brisco v. United States, 368 F.2d 214 (3rd Cir. 1966); Carter v. United States, 113 U.S.App.D.C. 123, 306 F.2d 283, 285 (1962); In re Herrara, 23 Cal. 2d 206, 143 P.2d 345 (1943).

6. Petitioners have received certain benefits which are denied to the adult offender. Thus, they have no criminal record; they have not been incarcerated with hardened adult offenders; and they had a continuous opportunity to seek an early release. Moreover, their evidence does not include the matter developed at their respective dispositional hearings, and therefore any comparison between them and their hypothetical adult counterparts is necessarily incomplete.

7. Nor would the other constitutional claims advanced here, though not argued below, entitle petitioners to their release. The evidence concerning the use of thorazine and prolonged solitary confinement convinced the trial court that petitioners were entitled to relief under the Eighth Amendment. The court found, however, that reforms had alleviated conditions at Sheridan; his order to discontinue the use of thorazine, to transfer petitioners to another institution, and to require that their future treatment accord with the humane purposes of the statute represented appropriate relief for the violation of their Eighth Amendment rights. Past violations of those rights do not necessarily entitle them to unconditional release. And since petitioners have not challenged the statutory procedure, the adequacy of the findings at their respective dispositional hearings, or the State's jurisdiction to deprive a juvenile delinquent of his liberty until he reaches the age of twenty-one, their due process argument is without force.

fully sought expedited review in the Illinois appellate courts. When the trial judge learned that, notwithstanding petitioners' bona fide efforts to obtain it, the transcript of the May hearing was not yet available, and was informally apprised of the risk that routine handling of the appeals in the overloaded Illinois courts might moot the issues before any relief could be granted, he understandably reacted unfavorably to the State's exhaustion argument. In the context of his impromptu remarks, he made the following statement:

> "Illinois is notorious in its Juvenile Court in its history of mistreatment, legal mistreatment, under a guise of legal parentage, parenthood attitude, but the rights under the Constitution inure to the benefit of the newborn infant as much as they do to the most venerable citizen among us."

On the following Monday, before any evidence was heard, respondent filed a motion pursuant to 28 U.S.C. § 144 requesting the district judge to recuse himself.[8] The motion was supported by an affidavit of one of the attorneys for respondent rather than the affidavit of a "party" as required by the statute. The motion was, therefore, insufficient. *Giebe v. Pence*, 431 F.2d 942 (9th Cir. 1970).

### B.

If there is a substantial likelihood that a judge's conduct would prejudice the jury, a new trial must be directed.[9] In a case tried without a jury, that danger of prejudice is absent; accordingly, the judge may properly play a more active and critical part in such a trial without impairing his ability to give the parties a fair hearing and to rule impartially after the record is complete. Nevertheless, the presiding judge must require the barristers and the litigants to observe and to respect the standards of decorum that are traditional attributes of a fair trial. By his own example, as well as by his rulings, the judge must confirm the objectivity and majesty of the judicial process. The integrity of the proceeding, not merely its ultimate outcome, must command the confidence of the community. The conduct of this trial fell short of the high standards that are required.

Respondent's attack on the judge's conduct of the trial is three-pronged. He contends that the judge (1) prejudged the merits; (2) assumed the role of advocate; and (3) exhibited unprovoked hostility toward counsel.

Before commenting on each of these points, it is only fair to observe that certain conduct on the part of counsel for respondent could only be offensive to the sensibilities of the judge. We mention this fact to indicate that although some of the court's comments did not appear to have any immediate provocation, respondent's counsel are not completely innocent victims of judicial intemperance.

After denying the State's motion to dismiss on Friday, October 15, the court ordered respondent's counsel to produce the four petitioners at the evidentiary hearing commencing at 10:00 o'clock A. M. on the following Monday. Counsel did not comply with that order, but instead presented the motion to recuse which we have held insufficient. They sought to justify what the district court correctly described as contemptuous conduct on the ground that they had been confident that their motion to recuse would be granted. We share the trial judge's unfavorable reaction to a lawyer's prejudgment of the merits of his own motion. Although some of the court's remarks were inappropriate, they

---

8. In addition to the comment quoted in the text, the motion also asserted that the judge's statement that it takes two years to prosecute an appeal in the courts of Illinois evidenced prejudice against respond-

ent. The State, understandably, does not press that point here.

9. See *United States v. Dellinger*, 472 F.2d 340 (7th Cir., 1972).

were less severe than the punishment he had the power to impose.

As the case progressed, counsel for respondent properly objected to inadmissible evidence and urged the court to adhere to normal adversary procedures in the quest for the truth. But on occasion, as sometimes happens in the heat of advocacy, counsel's conduct impliedly demeaned the seriousness of petitioners' claims. The judge, sensitive to the plight of the young men who had repeatedly been injected with thorazine and incarcerated in solitary confinement for long periods of time, reacted unfavorably to the implications that this was just another ordinary lawsuit.[10] Nevertheless, there is merit in portions of respondent's criticism of the conduct of the trial.

 Respondent's claim that the trial judge prejudged the merits is be-

lied by a reading of the record as a whole including the court's final ruling. There is no indication that respondent was unable to present his case. Moreover, the record does not support the conclusion that the trial judge had closed his mind to the presentation of evidence or argument. It is true that some of his comments were unfortunate. He had obviously read widely in the professional literature relating to the use of thorazine, to the problem of the youthful offender, and to correctional philosophy. But a judge should not be criticized for making an impartial study of relevant scholarship or for candidly advising counsel of the results of such research. Therefore, although we agree that some of the trial judge's observations relating to the merits tended to impede the orderly development of the case and were even inappropriate,[11] we categorically reject the prejudgment contention.

10. Early in the trial, one of the lawyers indicated that he had no need for a daily transcript, even though he had not been present at earlier sessions; in colloquy a few days later, he supported an argument by quotation from the transcript. On another occasion he conditioned his voluntary production of a document on withdrawal of his adversary's expression of surprise at his apparently unusual willingness to produce anything without formal process.

11. In a colloquy relating to the admissibility of certain evidence concerning one of the petitioners, the court stated:

"THE COURT: He would like to say to the administration of justice and law, 'When I am picked up by the policeman or I am taken to some agency and I am diverted here or there and I am worked with and I am helped or I am not helped, that is one thing, but when I walk into a court, through the portals of a court, a formal court proceedings, even though it be called a juvenile court, then I expect to be in court and I expect to have a lawyer; I expect to have witnesses testify against me; I expect to have a right to have a crime proved against me. I do not expect to be told "You are just a little boy. Now we are going to take all of these things that have accumulated in your records, in the police files, being picked up here and picked up there, and we are going to hold those against you, and we are going to

assume that you are not suited to live out here in society and, therefore, we are going to commit you to the custody of the division of youth of the Department of Corrections, and we are going to commit you until you are 21 years of age unless sooner that commitment is terminated, and if you act out too badly we are going to send you to a security jail such as Sheridan—" '

"MR. FRIEDMAN: I would take exceptions to the term 'jail.'

"THE COURT: (Continuing) ' "— and if you act out badly there and we can't yet along with you there, why, then we are going to give you doses of tranquilizers, shots of tranquilizers in the hip and knock you out so we don't have to strap you down or have to listen to you banging against the cells." '

"It is small wonder that there haven't been more Atticas already if those in charge in our state institutions are so slow in reading up on the newest literature in the field of penology and trying constantly to improve things, and not leave them always as they were ten, fifteen, twenty years ago, and then send their finest lawyers to stand up against an effort to try to straighten things out, instead of sending their best lawyers over to meet these other lawyers and say, 'Look, let's cooperatively sit down to see what we can do to straighten these things out and help and improve the situation.' " Tr. 393–395.

The charge that the judge occasionally assumed the role of an advocate has more substance. He invited counsel for petitioners to expand the theory of their case to assert claims on behalf of the entire class of inmates at Sheridan.[12] At times the court interjected unfavorable comment on the testimony as it developed,[13] took over the examination of witnesses, or, after petitioners' counsel had concluded his examination, urged him to continue to dig for additional evidence.[14] In response to petitioners' suggestion that the court visit Sheridan to view the physical plant, a suggestion which respondent did not oppose, the court, on his own initiative, suggested that evidentiary hearings be held at the institution. A legitimate objection to such hearings prompted intemperate remarks by the court suggesting that the State's unfavorable reaction to the proposal might necessitate the use of military force to overcome anticipated resistance to his visit to Sheridan.[15]

12. See, e. g., Tr. 432–433, 449.

13. "BY MR. MURPHY:
"Q. Captain Shockley, am I to understand it is your testimony that you do recall bringing boys over for what you assumed to be shots of Thorazine, is that correct?
"A. Yes, sir.
"Q. And when is the last time that you can recall bringing such a boy over?
"A. Myself?
"THE COURT: He wasn't talking about anybody but you, sir.
"THE WITNESS: When—
"THE COURT: 'Myself' indicates that you don't really want to answer his question.
"MR. ZAGEL: I am going to object to your Honor's last remark and ask that it be stricken.
"THE COURT: Let the record show that you object to any remark I make, and your objection is overruled. The next one is overruled." Tr. 1205.

14. "MR. MURPHY: I have no further questions of this witness.
"THE COURT: Are you quitting because of disgust, or what?
"MR. MURPHY: Pardon?
"THE COURT: Dig in, man, dig in.
"MR. MURPHY: Well, I—
"MR. FRIEDMAN: I would object to the Court's statement. I would ask it be stricken from the record.
"THE COURT: Will you stop asking —objecting to what I say?
"MR. FRIEDMAN: If the Court instructs me not to make further objections, I will follow the Court's instruction.
"THE COURT: Get along with me, man. I am not ruling against you.
"MR. FRIEDMAN: May I have merely an indication—
"THE COURT: Nor am I ruling for the other side. But just popping up and popping out, objecting to whatever I say —I am going to be asking questions all the way through.
"MR. FRIEDMAN: Until I am instructed otherwise specifically by the Court, it is my prerogative as counsel to object to those questions I believe improper. It is my duty to do so as representing a party in this case.
"If the Court instructs me otherwise, I will refrain.
"THE COURT: You may object every 30 seconds.
"MR. MURPHY: May I proceed with my cross examination?
"THE COURT: You are free to object. The objection is overruled.
"MR. MURPHY: May I proceed with my cross examination?
"MR. FRIEDMAN: May I accumulate those 30 seconds?
"THE COURT: You may object every minute, every 30 seconds, every two minutes, five minutes. Any time I open my mouth you may object.
"MR. FRIEDMAN: Thank you, your Honor." Tr. 737–739.

15. At one of the sessions at which a possible visit to Sheridan was discussed, the judge stated in part:
"If I go, I have to go as a court and I have to convene a session, a special session of the court, inside the facility, and as I would be moving about the facility, my court reporter would be there, I would have my robe on, the Marshal would open court, the clerk would call the case and, with my robe on, I would proceed throughout the facility; be particularly concerned with one of the cell houses, be particularly concerned with what the boys have testified as constitute the hole or areas of solitary confinement.
"I would be concerned also with what evidence the plaintiffs would want by special subpoena serve it then and there to hear about the use of Thorazine for

There is also substance to respondent's objection to the court's manifestation of hostility against counsel. Although he subsequently apologized, the judge made certain deprecatory comments about counsel that have no place in the trial of a lawsuit.[16]

Instead of ruling promptly and decisively on objections, on occasion his discursive comments provoked digressions which became unnecessarily hostile.[17] He quite plainly resented counsel's objections to his own examination of certain witnesses, although it is

> physical control of inmates, from nurses, from officials.
>
> "These things may stand admitted in the record unless the defendants are first allowed to put on some contradictory evidence, but, more than that, in holding a court session—and sessions of the Federal Court are public, and though there is some difficulty with relation to whether or not outside of the Court House members of the press using photographic equipment would be permitted in the light of the canons of ethics, our local rule does not apply to anything but this court building and the court building at Freeport. It would not apply to special sessions held outside of these two structures.
>
> "Now, if I were to go and not be received at the entrance of that facility, or if I were to go and be told, 'You, Judge, can be received and you can hold your court but the public cannot come in, that is, the press,' I would not enter then. I would call a session immediately on the outside of the institution and recess back to the chambers here for further orders and confer with the executive branch of the Government for sufficient authority, sufficient force of arms to cause the United States Marshal for the day of my appearance to take custody of the institution itself and, if necessary, to call in the military forces to effect that, so that I would not be disturbed in my proceeding in a judicial hearing. I have not received that kind of an invitation. I would like to give counsel, and I consider them excellent gentlemen, particularly the attorney general of the State of Illinois, a very fine gentleman—an opportunity to work out with plaintiffs' counsel such an invitation, if I need to go, such an extension of an arm or hand of welcome. I would prefer not, either in the defense of the dignity and the propriety and the authority of the court or in the defense of the public, who can see and hear only through the press, to attend upon public trials, to have to use force. I would prefer not to have to do that.
>
> "I contemplate that if I went this afternoon with nothing more, that I would have to return and plan the use of a forceful entry. I would prefer not to have to do that." Tr. 434–436.

16. "THE COURT: I would prefer rather than to hear the argumentation of counsel—what is your name?
"MR. FRIEDMAN: Friedman, sir.
"THE COURT: —Friedman, whose voice irritates me a little bit—
"MR. FRIEDMAN: I beg the Court's pardon.
"THE COURT: That is something that you can't control. It is just the sound of your voice is irritating—(continuing)—to let him have his way and get this over with." Tr. 386–387.
Later in the same session:
"MR. FRIEDMAN: The State's position is that these juveniles ought not to be released from the custody of Joseph Coughlin—
"THE COURT: Even the word as you pronounce it there, sir, sounds as though there is something onerous about being one—'juvenile.'
"MR. FRIEDMAN: Well, the Court takes exception with my tone of voice and the Court takes exception to my pronunciation, I deeply regret—
"THE COURT: I can't help but observe that I think that there are too many of us, once we cross the barrier that separates youth from everyone else, become anti-youth. We hate children." Tr. 397.
The following occurred during petitioners' cross-examination of a witness tendered by respondent:
"THE COURT: Do you have co-counsel?
"MR. WENZELL: Pardon me?
"THE COURT: Do you have co-counsel?
"MR. WENZELL: Mr. Murphy.
"THE COURT: I saw a gentleman who was seated with this witness get up and leave along with co-counsel for one of the attorneys for the respondent. Usually where there are co-counsel at a table, one gets up and goes out and sees what is going on.
"MR. WENZELL: Thank you, your Honor.
"THE COURT: Wake up." Tr. 997.

17. "THE COURT: What did he say about that?
"MR. ZAGEL: Your Honor, I object to this question you have just asked, and I would ask that the last answer of

Note 17—Continued

the witness be stricken. It refers to a conversation of a witness who is not subject to cross examination. It is not —it is obviously offered for its truth.

"THE COURT: This witness is subject to cross examination.

"MR. ZAGEL: Yes, but the person whose accusations are being made in court is not subject to cross examination.

"THE COURT: Why?

"MR. ZAGEL: Because Mr. Daniels —is that his name?—is not here in court, and it is the statements of Mr. Daniels this witness is relating.

"THE COURT: Well, you can subpoena him.

. "MR. ZAGEL: I am sorry; it is not a question of whether I can subpoena him, it is a question of the respondent's right to cross examination, which your Honor is denying.

"THE COURT: Well, on sur-rebuttal you can call him.

"MR. ZAGEL: I do not wish to call Mr. Daniels. I wish to cross examine Mr. Daniels.

"THE COURT: You may call him in, and if he is a hostile witness I will certainly allow you to cross examine him.

"MR. ZAGEL: I am sorry, I do not wish to call Mr. Daniels.

"THE COURT: If you wished, could you.

"MR. FRIEDMAN: The question is only one of fair trial, your Honor. These statements of the witness which are asserted for the truth of the proposition, which are being heard for the truth of the proposition stated therein, herein now are not subject to cross examination.

"That is the classic definition, if the Court please, of hearsay.

"THE COURT: You two gentlemen from the Attorney General's office may not realize it, but I admire you, I admire you, and I think that your client has excellent attorneys. You are doing a good job for your client.

"A petition for a writ of habeas corpus addresses itself somewhat to the traditional equity jurisdiction of the Court, which is very broad very, very broad, and is not to be—because we don't have a jury, we are really in chancery, historically. It addresses itself to an attempt on the part of the Court to get from all of the parties and from whatever sources the Court may determine to get from, the facts that underlie the petition that is presented before me.

"Now, I don't believe that personally you two fine lawyers would want to withhold from me anything, but you are doing so magnificent a job that were it not for the fact that I refuse to be in any way charged with being biased or predisposed in the matter, I could not but conclude that somewhere along the way somebody is saying, 'Don't let that Judge know anything more than just the bare little bit of facts about this. Keep him out of this. Keep everything out of his ears. Don't let there be an expose out of this case. Keep it as tight as you possibly can. Raise every kind of objection. Object to him. Object to his questions. Object to everybody else's questions. Just don't let anything get in.'

"Well, I am just going to let it in. I want to know about it. I can't be fair to both sides, and that includes the respondent, unless I am given a full panoramic view of this whole thing, and I cannot afford to be restrained by technical restrictions that would apply to personal injury cases.

"MR. ZAGEL: Your Honor, in response—

"THE COURT: A motion that I disqualify myself. I know what it is. Motion denied.

"MR. ZAGEL: In response to your Honor's statement, I would point out that your Honor has made several serious errors of law. The first is that a writ of habeas corpus is not a writ in equity, it is a writ in law—

"THE COURT: I did not say it was a writ in equity.

"MR. ZAGEL: The procedure under a writ of habeas corpus is a procedure in law. The rules of evidence I have rarely heard referred to as a mild technicality which can be brushed aside by a Court.

"The right that you are denying, the right that the rule of evidence in question here is designed to protect, is considered one of the most sacred in American law. It is the right of cross examination. You are denying that right to the respondents.

"Furthermore, your Honor—

"THE COURT: Cross examination of this witness? You have a right to cross examine.

"MR. ZAGEL: I do not have adequate cross examination because you are allowing hearsay evidence, and the essence of the hearsay rule—

"THE COURT: Why is it hearsay if it was at your penitentiary or training school—Let me correct that—and the conversation took place with the consent of your official?

perfectly clear that a lawyer has the same right and duty to object to questions propounded by a judge as to those propounded by opposing counsel.[18]

"MR ZAGEL: Your Honor—

"THE COURT: You were technically present and, therefore, it is not hearsay, Counsel.

"MR. ZAGEL: Your Honor has grossly misstated the hearsay rule.

"THE COURT: I have not grossly misstated it, and I warn you, be very careful of the use of your words when you object to my objecting to your objecting.

"MR. ZAGEL: The hearsay rule, your Honor—

"THE COURT: I tell you, I say, be very careful. You sit down for a minute. Both of you sit down." Tr. 1022–1028.

18. "Q. And do you know whether she had an advance degree?

A. She had a Bachelor's degree in sociology.

"Q. Now, did you talk—

"THE COURT: Do you mean a twenty-two year old girl just out of college was a counsellor of this boy?

"THE WITNESS: At the time she was the only female working in the institution, and she told me that she was the only one in the state or the country, female working in a maximum security penal institution, and that is what she had always wanted to do.

"She was quite proud that she was there.

"MR. ZAGEL: I would object.

"THE COURT: From what town— if you know, from where did she come?

"THE WITNESS: Some place sort of nearby, because she could drive to the institution and back every day.

"THE COURT: But where was her original home?

"THE WITNESS: Some place in that town. She was living with her parents.

"THE COURT: Oh, she wasn't from a big urban center like Chicago?

"THE WITNESS: No.

"THE COURT: I suppose she visited Chicago, if you know?

"THE WITNESS: I don't know.

"MR. ZAGEL: Object to the last four—

"THE COURT: A little country girl, is that it, with a college education, from a small country—small state university in sociology, who comes to be a counsellor at twenty-two of a boy in need of psychiatric assistance, in a state institution, who is of a different race, and different ethnic environmental background from the youth?

"THE WITNESS: She impressed me as being very naive and not aware at all what she was into. She was a very tiny little girl, and people responded to her that way. The guards were very protective of her. They won't let her walk any place alone on the grounds.

"MR. ZAGEL: May I voice an objection, your Honor?

"THE COURT: What was the result of your conversation with her?

"MR. ZAGEL: Your Honor, may I voice an objection?

"THE COURT: Yes. It is so voiced and the record may show.

"MR. ZAGEL: I am objecting to the discussion of Miss or Mrs. Weir, I don't know what she is. I object to your Honor's characterization.

"THE COURT: I was asking questions, Counsel.

"MR. ZAGEL: There were questions that contained assumptions to which I object, one of which was that Carmen Tate was in need of psychiatric assistance.

"THE COURT: That is what she said.

"MR. ZAGEL: I don't—

"THE COURT: Didn't you say that?

"THE WITNESS: I am not the only one who said it.

"MR. ZAGEL: Your Honor, I don't—

"MR. FRIEDMAN: Object to that last remark of the witness and ask that it be stricken, that she is not the only one that said it. That was uncalled for. The objection was not directed to her, it was directed to your Honor. I ask that it be stricken.

"THE COURT: Well, then let the record show that both of you are driving at me with both knives. Go ahead, both of you, as hard as you can.

"MR. FRIEDMAN: Well—

"MR. ZAGEL: Your Honor, I think again at this time I ought to ask your Honor to recuse himself. I have been accused—

"THE COURT: I have nothing against your client.

"MR. ZAGEL: I have been accused, your Honor, twice—

"THE COURT: I don't even dislike you two young men.

"MR. ZAGEL: Twice, twice.

"THE COURT: I think you are overplaying your hand in defense of your client. You don't have to go as far as you have gone. It is almost to the point

It is impossible to capture the full flavor of a trial from the record on appeal. Nevertheless, the excerpts set forth in the margin are sufficient to explain why we conclude that if any further proceedings shall be necessary in this case, they should be conducted by a different judge.

Two of the appellants in this case are among the plaintiffs representing the entire class of inmates at Sheridan in litigation pending before Judge Bauer.[19] They have joined in an application for an extraordinary writ [20] to require expedition of those proceedings which were temporarily stayed to await a decision

of becoming obnoxious to the Court, and insulting, and in total disregard of the dignity of the Court.

"MR. ZAGEL: Your Honor—

"THE COURT: But I said 'almost'. Now, you may voice your objection. I am giving you permission to do it. But I did interrupt you to indicate that the reference which you gave was to something to which the witness had testified, and the record will so show.

"MR. ZAGEL: Your Honor—

"THE COURT: What is the rest of your objection?

"MR. ZAGEL: I have, in addition to my initial objection, I have the following comment, which I think I am entitled to—

"THE COURT: Is it an objection?

"MR. ZAGEL: It is an objection to your Honor's remarks.

"THE COURT: What is the objection?

"MR. ZAGEL: The objection is that it is highly improper for your Honor to characterize attorneys who are making objections on behalf of clients as having their knives out. It is the first time that I have ever been in a court of law in which a Court has regarded the making of objections as in any way an attempt to obscure the issues.

"It is Hornbook law that objections are not to be construed in that light. I believe that each and every one of the objections we made was made in perfect—

"THE COURT: Do you mean that I am supposed to sit here and let you go on for hours and hours and enunciate an objection after I have ruled on your objection, and then the other jump up beside you and start screaming at me, and you in our subtle voice to be persistent and go on and on and on, and that both of you object and object to every question that is asked, one after another, in an attempt, what appears to be an effort to frustrate these proceedings?

"This is almost Kuntslerism.

"MR. ZAGEL: Your Honor—

"THE COURT: And I have nothing but compassion for you at this time.

"I am asking you to make your objection quickly, in a few words, without comments, and—

"MR. ZAGEL: Your Honor—

"THE COURT: And then let me rule on it.

"MR. ZAGEL: Your Honor, the record will show—

"THE COURT: State your objection. What is your objection?

"MR. ZAGEL: Your Honor, the record will show that I attempted to make an objection—

"THE COURT: Just make the objection, sir.

"MR. ZAGEL: I object to your Honor's ruling—

"THE COURT: All right.

"MR. ZAGEL: —with respect to my objection.

"THE COURT: What other objection do you have?

"MR. ZAGEL: I object to your Honor's statement with respect to the conduct of myself and my co-counsel.

"THE COURT: What other objection do you have?

"MR. ZAGEL: I object to eliciting hearsay from this witness.

"THE COURT: What other objection do—

"MR. ZAGEL: And I object finally to your taking over examination of a witness, assuming a role, not as a Judge, but as a—

"THE COURT: You object to my taking over the examination of the witness?

"MR. ZAGEL: Yes.

"THE COURT: That is sufficient.

"MR. ZAGEL: Yes, I do.

"THE COURT: The objection—The first objection is overruled. The second objection is overruled. The third objection is overruled. The fourth objection is overruled." Tr. 1070–1077.

19. Terry L. Wilson, et al. v. Peter Bensinger, et al., No. 71 C 2094.

20. Terry L. Wilson, et al. v. Honorable William J. Bauer, No. Misc. 1385.

by the Illinois Supreme Court in litigation in which apparently some of the same parties raised issues which partially overlap the issues in these two federal cases. It would appear that under the district court's procedures for the processing of related cases, the reassignment of this case should therefore be to Judge Bauer, particularly since there appears to be no valid reason for further delay in the commencement of such hearings as may be necessary in the class action. The order of the district court is affirmed; further proceedings, if any, shall be conducted by Judge Bauer.