# RALSTON, WARDEN v. ROBINSON

No. 80–2049.   Argued October 5, 1981—Decided December 2, 1981

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 221. STEVENS, J., filed a dissenting opinion, in which BRENNAN and O'CONNOR, JJ., joined, *post*, p. 223.

*David A. Strauss* argued the cause *pro hac vice* for petitioner. With him on the briefs were *Solicitor General Lee,* *Assistant Attorney General Jensen, Deputy Solicitor General Frey,* and *William G. Otis.*

*Jerold S. Solovy,* by appointment of the Court, 453 U. S. 921, argued the cause and filed a brief for respondent.

JUSTICE MARSHALL delivered the opinion of the Court.

We granted certiorari in this case, 452 U. S. 960 (1981), to decide whether a youth offender who is sentenced to a consecutive adult term of imprisonment while serving a sentence imposed under the Federal Youth Corrections Act (YCA), 18 U. S. C. § 5005 *et seq.*, must receive YCA treatment for the remainder of his youth sentence. The Courts of Appeals are in conflict on this issue.[1] We conclude that the YCA does not require such treatment if the judge imposing the subsequent adult sentence determines that the youth will not benefit from further YCA treatment during the remainder of his youth sentence. Accordingly, we reverse the judgment of the Court of Appeals.

I

In 1974 respondent, who was 17 years old, pleaded guilty to a charge of second-degree murder and was sentenced to a 10-year term of imprisonment under the YCA, § 5010(c). The sentencing judge recommended that he be placed at the

---

[1] In this case, the United States Court of Appeals for the Seventh Circuit gave an affirmative answer to the question presented. See 642 F. 2d 1077 (1981). The United States Court of Appeals for the Third Circuit, *Thompson* v. *Carlson,* 624 F. 2d 415 (1980), gave a negative answer, holding that a judge's determination that the offender would not benefit from YCA treatment warrants treating him immediately as an adult. The United States Court of Appeals for the Fourth Circuit, *Outing* v. *Bell,* 632 F. 2d 1144 (1980), cert. denied *sub nom. Outing* v. *Smith,* 450 U. S. 1001 (1981), also gave a negative answer, holding that the policy of prison officials warrants treating him as an adult.

Kennedy Youth Center in Morgantown, W. Va.; that he not be released until he had attained at least an eighth-grade level of education and had successfully completed a trade of his own choosing; and that he participate in intensive, individual therapy on a weekly basis and undergo a complete psychological reevaluation before being returned to the community. The sentence, like all YCA sentences, contemplated that the respondent be segregated from adult offenders. See 18 U. S. C. § 5011.

Respondent's subsequent conduct has not been exemplary. In 1975, while incarcerated at the Federal Correctional Institution (FCI) at Ashland, Ky., respondent was found guilty of assaulting a federal officer by use of a dangerous weapon, in violation of 18 U. S. C. §§ 111 and 1114. The United States District Court for the Eastern District of Kentucky imposed an additional 10-year adult sentence and stated in its commitment order: "The Court finds that the defendant will not benefit any further under the provisions of the [YCA] and declines to sentence under said act." After receiving a presentence report, the judge reduced the sentence to 66 months, to be served consecutively to the YCA sentence. The judge also recommended that respondent be transferred from the Kentucky institution "to a facility providing greater security."

Respondent was placed in the Federal Correctional Institution at Oxford, Wis. Subsequent disciplinary problems resulted in his transfer to the FCI at Lompoc, Cal. In 1977, while confined in that institution, respondent pleaded guilty to another charge of assaulting a federal officer. The United States District Court for the Central District of California sentenced him under 18 U. S. C. § 5010(d) to an adult sentence of one year and one day and ordered that the sentence run consecutive to and not concurrent with the sentence that respondent was then serving.

After the second adult sentence, the Bureau of Prisons classified respondent as an adult offender. Accordingly, at

least since that time,[2] respondent has not been segregated from the adult prisoners, and has not been offered the YCA rehabilitative treatment that the initial trial court recommended. The Bureau of Prisons acted pursuant to a written policy when it classified respondent as an adult. In implementing the YCA's treatment and segregation requirements, the Bureau narrowly defines a "YCA Inmate" as "any inmate sentenced under 18 USC Section 5010(b), (c), or (e) *who is not also sentenced to a concurrent or consecutive adult term,* whether state or federal." Bureau of Prisons Policy Statement No. 5215.2, p. 1 (Dec. 12, 1978) (emphasis added).

Respondent exhausted his administrative remedies and filed a petition for habeas corpus on May 25, 1978. The Magistrate recommended transfer to an institution in which respondent would be segregated from adults and would receive YCA treatment. The United States District Court for the Southern District of Illinois issued an order granting the writ, which was affirmed by the United States Court of Appeals for the Seventh Circuit. 642 F. 2d 1077 (1981). The Court of Appeals held that the YCA forbids the reevaluation of a YCA sentence by a second judge, even if the second judge makes an explicit finding that further YCA treatment would not benefit the offender. The Court of Appeals also rejected petitioner's broader argument that the YCA vests discretion in the Bureau of Prisons to modify the treatment terms of a YCA sentence when the offender has received a consecutive or concurrent adult sentence for a felony.

On January 9, 1982, respondent will be conditionally released from his YCA sentence and will begin his first adult sentence.

---

[2] Respondent asserts that he has never been segregated from non-YCA prisoners nor received special YCA treatment. Although petitioner disputes this assertion, the record of frequent transfers lends some credence to respondent's claim. Given our disposition of this case, we need not address this issue.

## II

In *Dorszynski* v. *United States*, 418 U. S. 424 (1974), this Court exhaustively analyzed the history, structure, and underlying policies of the YCA. From that analysis, and from the language of the YCA, two relevant principles emerge. First, the YCA strongly endorses the discretionary power of a judge to choose among available sentencing options. Second, the YCA prescribes certain basic conditions of treatment for YCA offenders.

In *Dorszynski*, THE CHIEF JUSTICE, writing for the Court, found that the principal purpose of the YCA is to rehabilitate persons who, because of their youth, are unusually vulnerable to the danger of recidivism:

> "To accomplish this objective, federal district judges were given two new alternatives to add to the array of sentencing options previously available to them . . . : first, they were enabled to commit an eligible offender to the custody of the Attorney General for treatment under the Act. 18 U. S. C. §§ 5010(b) and (c). Second, if they believed an offender did not need commitment, they were authorized to place him on probation under the Act. 18 U. S. C. § 5010(a). If the sentencing court chose the first alternative, the youth offender would be committed to the program of treatment created by the Act." *Id.*, at 433.[3]

If a court wishes to sentence a youth to an adult sentence, it is authorized to do so under § 5010(d). In *Dorszynski*, a

---

[3] Under § 5010(b) and § 5017(c), a court is authorized to sentence an offender to an indeterminate YCA term of six years, even if the adult maximum sentence would be a lesser term. Under § 5010(c) and § 5017(d), if a court finds that the offender may not be able to derive maximum benefit from YCA treatment within six years, it may impose a YCA term of any length authorized by law for the crimes of which the offender is convicted. Respondent was initially sentenced under the latter provisions to a 10-year term; the maximum adult penalty for his crime (second-degree murder) was life imprisonment.

majority of this Court held that a judge must make an explicit "no benefit" finding to invoke this subsection, but need not give a statement of reasons to justify his decision. Both the majority and concurring opinions emphasized that the YCA was not intended to disturb the broad discretion traditionally available to federal judges in choosing among appropriate sentences. 418 U. S., at 436–442; *id.*, at 450 (MARSHALL, J., with whom Douglas, BRENNAN, and Stewart, JJ., joined, concurring in judgment).

We reiterated that trial courts retain significant control over sentencing options in *Durst* v. *United States*, 434 U. S. 542 (1978), where we unanimously held that the YCA permits the court to impose a fine or require restitution when it places a youth on probation under § 5010(a). In his opinion for the Court, JUSTICE BRENNAN explained the underlying purposes of the Act:

> "The core concept of the YCA, like that of England's Borstal System upon which it is modeled, is that rehabilitative treatment should be substituted for retribution as a sentencing goal. Both the Borstal System and the YCA incorporate three features thought essential to the operation of a successful rehabilitative treatment program: flexibility in choosing among a variety of treatment settings and programs tailored to individual needs; separation of youth offenders from hardened criminals; and careful and flexible control of the duration of commitment and of supervised release." *Id.*, at 545–546 (footnotes omitted).

A second important feature of the YCA is that it empowers, and indeed requires, a judge to prescribe certain basic conditions of YCA treatment. This prescription ensures that treatable youth offenders are segregated from adult criminals, and that they receive appropriate rehabilitative care.

The need to segregate youth from adult criminals drew special attention in the legislative history. Proponents of

the statute criticized the practice of "herding youth with maturity, the novice with the sophisticate, the impressionable with the hardened, and . . . subjecting youth offenders to the evil influences of older criminals and their teaching of criminal techniques . . . ." H. R. Rep. No. 2979, 81st Cong., 2d Sess., 2–3 (1950); see 96 Cong. Rec. 15036 (1950). This concern was expressed in the statutory requirement that offenders receiving youth sentences be segregated from adults. 18 U. S. C. § 5011.[4] More generally, "[t]he panoply of treatment options available under the Act is but further evidence that the YCA program was intended to be sufficiently comprehensive to deal with all but the 'incorrigible' youth." *Dorszynski, supra,* at 449 (MARSHALL, J., concurring in judgment) (footnote omitted).

The YCA allocates responsibility for determining essential treatment conditions in an unusual way. Under traditional sentencing statutes, prison officials exercise almost unlimited discretion in imposing the security and treatment conditions that they believe appropriate. The YCA is different. By determining that the youth offender should be sentenced under the YCA, the trial court in effect decides two essential conditions of confinement: the Bureau of Prisons must comply with both the segregation and treatment requirements of the

---

[4] Section 5011 provides in full:

"Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment."

YCA. 18 U. S. C. § 5011. See *Brown* v. *Carlson*, 431 F. Supp. 755, 765 (WD Wis. 1977); Hearings on S. 1114 and S. 2609 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st Sess., 43–44 (1949) (statement of Judge Parker) (hereinafter 1949 Senate Hearings); Report to the Judicial Conference of the Committee on Punishment for Crime 8–9 (1942). The Bureau retains significant discretion in determining the conditions of confinement, see *infra*, at 211, but its discretion is limited by these requirements.

The history of the YCA's passage buttresses the conclusion that correctional authorities may not exercise any of the sentencing powers established in the Act:

> "The initial legislative proposal, an American Law Institute model Act, removed the power to sentence eligible offenders from the trial judges altogether and reposed that power in a correctional authority. Not surprisingly, that proposal brought swift and sharp criticism from the judges whose power was to be sharply curtailed. The next proposal, by the Judicial Conference, involved shared sentencing powers between trial judges and correctional authorities. It met with similar criticism. The 1949 proposal, which was finally enacted into law, retained sentencing power in the trial judge." *Dorszynski*, 418 U. S., at 446–447 (MARSHALL, J., with whom Douglas, BRENNAN, and Stewart, JJ., joined, concurring in judgment) (footnotes omitted).

This unusual responsibility for treatment conditions demands that the sentencing judge thoroughly understand all available facts relevant to the offender's treatment needs. Thus, the statute provides the trial court with the opportunity to obtain an extremely comprehensive presentence report, 18 U. S. C. § 5010(e). See S. Rep. No. 1180, 81st Cong., 1st Sess., 5 (1949); 1949 Senate Hearings, at 18–19 (statement of Chief Judge Laws); Hearings on H. R. 2139 and

H. R. 2140 Before Subcommittee No. 3 of the House Committee on the Judiciary, 78th Cong., 1st Sess., 63–64 (1943) (statement of Judge Laws). With this framework in mind, we will review the parties' statutory arguments.

## III

Respondent asserts that the express language of the YCA prohibits any modification of the basic terms of a YCA sentence before its expiration. Respondent first points to § 5010(c), which authorizes a court to "sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter for any further period [beyond six years] that may be authorized by law for the offense . . . or until discharged by the [United States Parole] Commission." Respondent also relies on § 5011, which provides that "[c]ommitted youth offenders . . . *shall undergo treatment* in institutions . . . that will provide the essential varieties of treatment," and that "[i]nsofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, *and such youth offenders shall be segregated from other offenders*, and classes of committed youth offenders shall be segregated according to their needs for treatment" (emphasis added). From this language, respondent argues that the essential segregation and treatment requirements of the initial YCA sentence cannot be modified before the sentence expires.

We are not persuaded by this interpretation. Section 5010 enables the sentencing court to determine whether a youth offender would benefit from treatment under the YCA. If the original sentencing court determines that such treatment would be beneficial, it may sentence the youth offender under § 5010(a), (b), or (c), or it may request additional information under § 5010(e). Once the original sentencing court has made this determination and has sentenced the offender under the YCA, § 5011 requires the Bureau of Prisons to carry out the mandate of the court with respect to the offend-

er's segregation and treatment needs. We do not read that language as requiring the judge to make an *irrevocable* determination of segregation or treatment needs, or as precluding a subsequent judge from redetermining those needs in light of intervening events.

At the other extreme, petitioner asserts that the YCA gives the Bureau of Prisons independent statutory authority to determine that a YCA offender will not benefit from YCA treatment. Petitioner believes that the Bureau can make such a determination at any time, whether or not an offender has committed a subsequent offense. We reject this extraordinarily broad interpretation, and any interpretation that would grant the Bureau independent authority to deny an offender the treatment and segregation from adults that a sentencing court mandates.

Prison officials do have a significant degree of discretionary authority under the YCA relevant to the treatment of youth offenders. The Bureau is responsible for studying the treatment needs of committed youth offenders, 18 U. S. C. § 5014, and for confining offenders and affording treatment "under such conditions as [the Director of the Bureau] believes best designed for the protection of the public." 18 U. S. C. § 5015(a)(3). It may commit or transfer offenders to any appropriate agency or institution, 18 U. S. C. §§ 5015(a)(2) and (b), and may provide treatment in a wide variety of institutional settings. 18 U. S. C. § 5011. Moreover, it has authority to recommend conditional release and otherwise to consult with the United States Parole Commission in the implementation of the YCA. 18 U. S. C. §§ 5014, 5015(a)(1), 5016, 5017.

However, the statute does not give the Bureau any discretion to modify the *basic* terms of treatment that a judge imposes under §§ 5010 and 5011. When a judge imposes a youth sentence under the YCA, the sentence commits the

youth to the custody of the Attorney General "for treatment and supervision pursuant to this chapter." 18 U. S. C. §§ 5010(b) and (c). Section 5011 provides two elements of mandatory treatment: first, youths must undergo treatment in an appropriate institution that will "provide the essential varieties of treatment"; second, "[i]nsofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment." These two elements of the program are statutorily mandated, and the discretion of the Bureau is limited to the flexible discharge of its responsibilities *within* these two broad constraints.[5]

Even if the Bureau asserted only the right to treat YCA offenders as adults in accordance with its Policy Statement, see *supra*, at 205, this assertion of power is much too broad. The policy would treat *any* youth offender with an adult con-

---

[5] Although the Courts of Appeals consistently have rejected the argument that the Bureau of Prisons may ignore the obligations under § 5011, they have not agreed on the degree of the flexibility the Bureau possesses in complying with the segregation requirement. This conflict arises from the requirement in § 5011 that certain obligations be discharged "[i]nsofar as practical." See n. 4, *supra*. See, *e. g., Watts* v. *Hadden*, 651 F. 2d 1354 (CA10 1981); *Outing* v. *Bell*, 632 F. 2d 1144 (CA4 1980), cert. denied *sub nom. Outing* v. *Smith*, 450 U. S. 1001 (1981); *United States ex rel. Dancy* v. *Arnold*, 572 F. 2d 107 (CA3 1978); *Harvin* v. *United States*, 144 U. S. App. D. C. 199, 445 F. 2d 675 (en banc), cert. denied, 404 U. S. 943 (1971); *Brown* v. *Carlson*, 431 F. Supp. 755 (WD Wis. 1977); *Johnson* v. *Bell*, 487 F. Supp. 977 (ED Mich. 1980).

We need not address the issue of the scope of the practicality exception in this case because petitioner's reliance on it is misplaced. Petitioner argues that because some "hardened" youths may be serving YCA sentences, it is "impractical" to segregate them from adults. The sentencing courts, however, determined that these "hardened" youths would benefit from YCA treatment and consequently should be segregated from adults and integrated with other youth offenders. Petitioner really questions the wisdom, not the practicality, of that determination.

secutive sentence as an adult—even if 15 years of his YCA sentence remained and the adult sentence were only for 1 year. It is unreasonable, indeed callous, to assume that such an offender could not receive any further benefit from YCA treatment. This example underscores the importance of leaving such decisions to the sound discretion of a federal sentencing judge, rather than to prison officials. The fatal defect in petitioner's argument is that it permits prison officials to make a determination—whether a YCA offender will benefit from YCA treatment—that the statute commits to the sentencing judge.

## IV

No provision of the YCA explicitly governs the issue before us. The statute describes the sentencing options available to a judge after conviction but does not elucidate what options would be available after the defendant has been convicted of a second crime while serving his initial sentence. The purposes of the statute, however, revealed in its structure and legislative history, compel the conclusion that a court faced with a choice of sentences for a youth offender still serving a YCA term is not deprived of the option of finding no further benefit in YCA treatment for the remainder of the term.

Under § 5010(d), a court sentencing an offender who is serving a youth term may make a "no benefit" finding and then "sentence the youth offender under any other applicable penalty provision." A judge is thus authorized to impose a consecutive adult term, as the second judge did in this case. However, the court also has before it the question whether the offender will benefit from YCA treatment during the remainder of the YCA term. Although § 5010(d) does not expressly authorize a second judge to make a "no benefit" finding with respect to the remainder of an unexpired YCA sentence, we believe that it implicitly authorizes such a determination, as well as the determination that YCA treat-

ment during the consecutive sentence would not be beneficial. It assuredly does *not* authorize prison officials to make either determination.

Our review of the legislative history reveals no explicit discussion of the trial court's options in sentencing a youth who commits a crime while serving a YCA sentence; Congress apparently did not consider this specific problem. But Congress did understand that the original treatment imposed by the sentencing judge might fail, and that protective as well as rehabilitative purposes might justify a lengthy confinement under § 5010(c). In commenting on that section, the House Report states: "This affords opportunity for the sentencing court to avail itself of the provisions of this bill and at the same time insure protection of the public if efforts at rehabilitation fail." H. R. Rep. No. 2979, 81st Cong., 2d Sess., 4 (1950).[6]

The history and structure of the YCA discussed above, *supra*, at 206–210, demonstrate Congress' intent that a court—but not prison officials—may require a youth offender to serve the remainder of a YCA sentence as an adult after the offender has received a consecutive adult term. First, the YCA prescribes certain basic elements of treatment, segregation from adults and individualized rehabilitative programs, as part of a YCA sentence. Second, sponsors of the Act repeatedly stated that its purpose was to prevent youths from becoming recidivists, and to insulate them from the insidious influence of more experienced adult criminals. Housing incorrigible youths with youths who show promise of rehabilitation would not serve this purpose. Third, the

---

[6] The same explanation was offered at the Senate hearings by the Chairman of the Committee that drafted the bill. 1949 Senate Hearings, at 62 (statement of Chief Judge Phillips). See also *id.*, at 13 (statement of Chief Judge Laws) (section is to be used "if the judge feels that a youth offender convicted of an offense calling for a long term under existing statutes might not respond to treatment within 6 years or that so short a term might have an adverse effect on enforcement of the law . . .").

decision whether to employ the unique treatment methods of the YCA is exclusively committed to the discretion of the sentencing judge, rather than to prison officials. If segregation of a particular class of youths from adults would be futile, that is a decision to be made by a court, not by prison authorities.

Finally, in light of the above, we do not believe that when Congress withdrew from prison officials some of their traditional authority to adjust the conditions of confinement over time, Congress intended that no one exercise that authority. The result would be an inflexible rule requiring, in many cases, the continuation of futile YCA treatment. The only reasonable conclusion is that Congress reposed that authority in the court, the institution that the YCA explicitly invests with the discretion to make the original decision about basic treatment conditions.

We find further support for this conclusion from the fact that, in several circumstances, the YCA permits a youth offender initially sentenced under the YCA to be treated as an adult for what would otherwise be the remainder of the YCA sentence.[7] For example, the statute permits a court to sentence a defendant to an adult term if he commits an adult offense after receiving a suspended sentence and probation under § 5010(a).[8] If respondent had been sentenced initially

---

[7] In other circumstances, the YCA contemplates reevaluation of the initial sentence—a judge may *reduce* the severity of the terms of commitment in light of changed circumstances. The YCA does not disturb "the power of any court to suspend the imposition or execution of any sentence and place a youth offender on probation." 18 U. S. C. § 5023. The YCA also permits a court to unconditionally discharge a youth on probation prior to the expiration of the probationary period and to issue a certificate to that effect. 18 U. S. C. § 5021. See *Thompson* v. *Carlson*, 624 F. 2d, at 421.

[8] By virtue of § 5023(a), the YCA incorporates 18 U. S. C. § 3653. Under the latter section, if a court has suspended the imposition of sentence and placed an offender on probation, the court, after revoking probation, may impose any sentence that it might have imposed originally. See

to probation under § 5010(a) and had been subsequently convicted of criminal assault, the court could have imposed an adult sentence for the original crime, for the assault, or for both, to begin immediately. In fact, respondent committed his second crime while incarcerated. It hardly seems logical to prohibit an immediate modification of respondent's treatment conditions simply because he originally received the harsher sentence of YCA incarceration.

Moreover, respondent concedes that the statute permits a judge to impose a *concurrent* adult sentence on an offender who is serving a YCA term.[9] Such an adult sentence would

generally *Durst* v. *United States*, 434 U. S. 542, 551 (1978) (§ 5023(a) "preserve[s] to sentencing judges their powers under the general probation statute when sentencing youth offenders to probation under § 5010(a)"). Section 5010(a) also authorizes the court to impose a YCA sentence but suspend its execution. If such an offender commits a crime while on probation, the court may require him to begin serving the YCA sentence immediately, or the court may impose an adult sentence for the second crime.

[9] We have no doubt that the second sentencing judge could have modified respondent's YCA treatment terms by imposing a concurrent sentence. The judge did not, however, avail himself of that option.

It would be anomalous to permit a concurrent sentence to modify the terms of the remainder of a YCA sentence but not to permit a consecutive term to have that effect, since a concurrent sentence is traditionally imposed as a *less* severe sanction than a consecutive sentence. See National Advisory Commission on Criminal Standards and Goals, Sentencing Standard 5.6 (1973); A. Campbell, Law of Sentencing § 76 (1978). Moreover, a consecutive sentence may be the preferable form of sentence for an offense committed while serving a sentence for a prior offense. See U. S. Dept. of Justice, Uniform Law Commissioners' Model Sentencing and Corrections Act § 3–107(c) (1979).

We see no relevant difference in the fact that concurrent sentences traditionally take effect immediately. As we hold today, a judge imposing a *consecutive* adult sentence may find that continued YCA treatment during the unexpired term would be futile, and his finding may take effect immediately. In either case, the YCA permits a judge to effectuate his finding with respect to whether future YCA treatment would be beneficial. Of course, a concurrent sentence of a given length will result in a shorter ultimate sentence than a consecutive sentence of that length; but a judge wish-

commence at the time that it was imposed and would modify the YCA treatment that the offender would otherwise receive for the remainder of his term. Finally, every offender sentenced under the YCA *must* be released conditionally two years prior to the termination of his sentence. 18 U. S. C. § 5017. However, if the offender violates the terms of this conditional release by committing a crime, the conditional release may be revoked and an adult sentence may immediately be imposed, notwithstanding the fact that the youth sentence has not yet expired. Respondent concedes as much, since he does not challenge the commencement of his adult term in January 1982, even though two years of his youth sentence will still remain.

We therefore conclude that a judge who sentences a youth offender to a consecutive adult term may require that the offender also serve the remainder of his youth sentence as an adult. Only this interpretation can give meaning to both the language and the underlying purposes of the YCA. "[W]e cannot, in the absence of an unmistakable directive, construe the Act in a manner which runs counter to the broad goals which Congress intended it to effectuate." *FTC* v. *Fred Meyer, Inc.*, 390 U. S. 341, 349 (1968). Accordingly, we hold that a judge may modify the essential terms of treatment of a continuing YCA sentence if he finds that such treatment would not benefit the offender further.[10]

---

ing to impose a longer ultimate sentence may simply increase the length of the concurrent sentence accordingly.

[10] The unusual characteristics of a YCA sentence answer respondent's complaint that a second judge cannot "revoke" the original sentence. To be sure, a judge's sentence is traditionally left undisturbed, even when subsequent events indicate that the original sentence was unduly lenient. Such a sentence cannot be "revoked," *i. e.*, a second judge cannot increase its length. On the other hand, tradition has vested wide discretion in prison officials to tailor conditions of confinement to the security requirements and treatment needs of the offender. A prison official's modification of such conditions because of an offender's misconduct would not be

## V

The standards that a district judge should apply in determining whether an offender will obtain any *further* benefit from YCA treatment are no different from the standards applied in imposing a sentence originally. Of course, the judge should consider the fact that the offender has been convicted of another crime. In light of all relevant factors, the court can exercise its sound discretion in determining whether the offender should receive youth or adult treatment for the re-

considered a "revocation" of the initial sentence. It is simply an appropriate recognition of the offender's changed circumstances. We think that a judge's modification is no different as a matter of policy. For the same reasons, we do not think that the second judge's modification of the conditions of the YCA sentence in light of the offender's changed circumstances is an impermissible review of the first judge's discretionary decision.

The dissenting opinion asserts that our interpretation of congressional intent is inconsistent with the common-law rule that " 'a punishment already partly suffered be not increased.'" *Post*, at 223. That common-law rule simply does not apply when Congress has provided a court with the power to modify a sentence in light of changed circumstances. For example, a court may impose a suspended sentence and probation, under the general probation statute or under the YCA. 18 U. S. C. § 3651 *et seq.*, § 5010. If the defendant violates the terms of his probation, the court may "increase" the punishment by requiring him to serve the initial sentence. Here, the statute permits a judge to modify the conditions of a YCA sentence if the offender is convicted of a subsequent adult crime and if further YCA treatment would be futile. In each case, the sentencing statute invests the court with the power to modify conditions in light of the subsequent offense.

The dissent reviews selective portions of the legislative history but never addresses a critical point. When Congress decided to invest the court with unusual authority over treatment conditions and to deny such authority to prison officials, it did not intend that no institution would have the authority to modify treatment conditions which become futile over time. JUSTICE STEVENS candidly admits that the interpretation he recommends may not "serve any useful purpose for this particular offender." *Post*, at 233–234. We do not believe that Congress was so shortsighted. In examining the sentencing options that the YCA grants to federal judges, we refuse to close our eyes to Congress' unmistakable rehabilitative intent.

mainder of his term. The court need not adopt a rigid rule of the type urged by petitioner. Rather, it should make a judgment informed by both the rehabilitative purposes of the YCA and the realistic circumstances of the offender.

Applying these principles to the facts before us, we conclude that the second sentencing judge made a sufficient finding that respondent would not benefit from YCA treatment during the remainder of his youth term.[11] The judge found that respondent would not benefit "further" under the YCA, and he declined to impose a youth sentence under that Act, imposing instead a consecutive adult sentence.[12] In the future, we expect that judges will eliminate interpretive difficulties by making an explicit "no benefit" finding with respect to the remainder of the YCA sentence.[13]

---

[11] Apparently, the Court of Appeals believed that a rehabilitative purpose may have existed here. However, given the facts of this case, any such belief is sheer speculation. After all, the second judge found that respondent would not benefit "further" from YCA treatment. In future cases, we emphasize, the sentencing judge has the responsibility for determining whether an offender would derive any rehabilitative benefit from receiving continued YCA treatment prior to serving an adult sentence.

[12] The judge's recommendation that respondent be transferred "to a facility providing greater security" is additional evidence that the judge did not believe that respondent would derive further benefit from YCA treatment.

[13] We need not address the question whether a judge may modify the basic treatment terms of a youth sentence whose length exceeds the maximum penalty authorized by law for an adult, since respondent's YCA sentence was imposed under § 5010(c), not § 5010(b). We recognize that if the basic treatment elements of a YCA sentence under § 5010(b) are modified at such a time that a youth effectively serves an adult sentence of greater length than an adult could receive, there would be a serious issue whether such a sentence is authorized by any statute and, if so, whether it violates the Equal Protection Clause. Cf. *Carter* v. *United States*, 113 U. S. App. D. C. 123, 125, 306 F. 2d 283, 285 (1962) (longer term under YCA constitutional, "essentially because such confinement cannot be equated with incarceration in an ordinary prison") (Burger, J.). We assume that district judges will keep these considerations in mind when deciding whether to modify YCA treatment terms of a sentence imposed under § 5010(b).

In conclusion, we are convinced that Congress did not intend that a person who commits serious crimes while serving a YCA sentence should automatically receive treatment that has proved futile. On the other hand, Congress carefully designed this statute to require a sentencing judge, rather than the Bureau of Prisons, to evaluate whether the basic elements of treatment—segregation from adults and individualized programs—are appropriate and consistent with YCA policies over time. Our interpretation comports with the overriding legislative purpose that "once a person [is] committed for treatment under the Act, the execution of sentence [is] to fit the person, not the crime." *Dorszynski*, 418 U. S., at 434.[14]

---

The dissent insists that the *quid pro quo* argument applies even to a sentence under § 5010(c), because such a sentence is "longer than an adult would generally receive." *Post*, at 231. Whether respondent's sentence was longer than he would have received as an adult is speculation—as is the suggestion that respondent might not have pleaded guilty had he known that the YCA conditions of his unexpired term could be converted to adult conditions *if* he were later to commit an adult crime and *if* the second judge were to find that further YCA treatment would be futile.

[14] Respondent argues that a statutory entitlement to segregation and treatment exists, and that a judge's subsequent modification of those conditions is a deprivation of due process and equal protection and a violation of double jeopardy. Because the lower court had no occasion to address these issues, 642 F. 2d, at 1079, n. 4, we will not address them in the first instance.

The dissenting opinion implies that our interpretation of the statute may violate the Double Jeopardy Clause. *Post*, at 224, n. 3. Although the issue is not properly before us, the suggestion deserves a response. Congress intended that a YCA sentence contain within it the possibility that, if the offender commits a subsequent offense, the court may modify the YCA treatment terms. Such a scheme hardly constitutes multiple punishment, since the offender has, by his own actions, triggered the condition that permits appropriate modification of the terms of confinement. After all, the imposition of confinement when an offender violates his term of probation has never been considered to raise a serious double jeopardy problem. See *United States* v. *DiFrancesco*, 449 U. S. 117, 137 (1980); *id.*, at 148 (no

We reverse the judgment of the Court of Appeals and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, concurring in the judgment.

The only question presented in this case is whether an offender, the respondent, serving a sentence under the Federal Youth Corrections Act (YCA), 18 U. S. C. § 5005 *et seq.*, and thereafter sentenced to a consecutive term of imprisonment as an adult, must nevertheless be separated from other adult offenders for the remainder of his sentence under that Act. I agree with the Court that the answer to this question must be in the negative. I write separately because it seems to me that the Court's opinion, in addressing broadly the authority of the Director of the Bureau of Prisons (the Director), may be read as unnecessarily curtailing his authority and discretion to act in other cases.

It was a District Court that imposed the consecutive adult term on respondent, but it was the Director who made the *decision* to treat respondent as an adult prisoner no longer entitled to be segregated from adult offenders. I agree with the Court as to the authority of the District Court to impose the consecutive adult term of imprisonment. I confine this concurrence to the issue of authority of the Director.

Respondent pleaded guilty to second-degree murder in 1974. The court sentenced him to 10 years of custody under the YCA. In 1975 respondent was convicted of assaulting a

double jeopardy problem because defendant is on notice that the sentence is conditional, and because "revocation of parole or probation only results from a change in circumstance subsequent to the grant of parole or probation") (BRENNAN, J., with whom WHITE, MARSHALL, and STEVENS, JJ., joined, dissenting). See also *Ex parte Lange*, 18 Wall. 163, 168 (1874) (Double Jeopardy Clause offers "complete protection of the party when a second punishment is proposed in the same court, *on the same facts*, for the same statutory offence") (emphasis added).

federal guard with a dangerous weapon. He was sentenced to a consecutive 10-year term. The District Court found "that the [respondent] will not benefit any further under the provisions of the Youth Offenders Act and decline[d] to sentence under said act." After it received a report from the Bureau of Prisons, however, the court took two additional actions. It reduced respondent's sentence to five and one-half years, and it recommended—*but did not order*—that respondent "be transferred from [the] Federal Youth Center . . . to a facility providing greater security." In 1977 respondent again was convicted of assaulting a federal guard. He again was given consecutive *adult* sentencing. Two courts thus certified that respondent had shown an incorrigibility and capacity for violence that warrants adult treatment.

In my view, certainly under these circumstances, the Director had the authority to treat the respondent as an adult offender. The YCA directs that youth offenders are to "undergo treatment in institutions of maximum security, medium security, or minimum security types . . . ." 18 U. S. C. § 5011. "'[T]reatment' means corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders . . . ." § 5006(f). The Director, *inter alia*, may "order the committed youth offender confined and afforded treatment *under such conditions as he believes best* designed for the protection of the public." § 5015(a)(3) (emphasis added). "The Director may transfer *at any time* a committed youth offender from one agency or institution to *any* other agency or institution." § 5015(b) (emphasis added). *"Insofar as practical*, . . . youth offenders shall be segregated from other offenders . . . ." § 5011 (emphasis added).

Thus, the express language of YCA vests broad discretion in the Director. It contains no mandatory directions that youth segregation must continue indefinitely no matter how clearly appropriate adult treatment may be. The statutory emphasis instead is on flexibility and individualized treat-

ment.   See 18 U. S. C. §§ 5005, 5014, 5016, 5017, 5018, and 5020.   The YCA does require youth offenders to be separated from adult offenders, but this command is qualified by the phrase "[i]nsofar as practical."   We need not in this case consider the limits on the discretion thus conferred.   This is an easy case in view of respondent's convictions as an adult offender and the findings of the federal courts.   In these circumstances the Director plainly had the authority—indeed the duty—to transfer respondent from the Federal Youth Center to a "facility providing greater security."   We properly defer to the Director's judgment that continued segregation from adult offenders is no longer "practical" under such circumstances.   Even in the absence of subsequent felony convictions, there could be occasions when, because of a youth offender's incorrigibility and threat to the safety of others, it would be highly *impractical* to continue his segregation in a youth center.   As we are not confronted with such a situation in this case, I would limit our decision to the record before us and defer to another day a general discussion of the Director's authority.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE O'CONNOR join, dissenting.

At common law a sentence could be amended during the term in which it was imposed subject to the limitation that "a punishment already partly suffered be not increased."[1] "The distinction that the court during the same term may amend a sentence so as to mitigate the punishment, but not so as to increase it," *United States* v. *Benz,* 282 U. S. 304,

---

[1] "As a general practice, the sentence, when imposed by a court of record, is within the power of the court during the session in which it is entered, and may be amended at any time during such session, *provided a punishment already partly suffered be not increased.*"   F. Wharton, Criminal Pleading and Practice § 913, p. 641 (9th ed. 1889) (emphasis added) (quoted in *United States* v. *Benz,* 282 U. S. 304, 307).

307, has been recognized by this Court over and over again.[2] Whether the well-settled rule prohibiting judges from increasing the severity of a sentence after it has become final is constitutionally mandated,[3] it is unquestionably the sort of rule that judges may not disregard without express authorization from Congress.[4]

---

[2] See, e. g., Whalen v. United States, 445 U. S. 684, 703 (REHNQUIST, J., dissenting); North Carolina v. Pearce, 395 U. S. 711, 730–731 (Douglas, J., concurring); id., at 747 (Harlan, J., concurring in part and dissenting in part); Reid v. Covert, 354 U. S. 1, 37, n. 68; Roberts v. United States, 320 U. S. 264, 265–266.

[3] "If there is anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offence." Ex parte Lange, 18 Wall. 163, 168.

Although United States v. DiFrancesco, 449 U. S. 117, purports to confine Ex parte Lange and United States v. Benz, supra, to their specific contexts, see 449 U. S., at 139, the Court's holding in DiFrancesco is limited to the situation in which Congress has expressly authorized an increase of sentence after the initial sentence has been set aside on direct appeal. It is conceded in this case that Congress did not expressly authorize the second sentencing judge to increase the severity of the unexpired YCA sentence.

It is perplexing, but noteworthy, that the Court's opinion, ante, at 220–221, n. 14, leaves the Court of Appeals free on remand to declare unconstitutional the Court's construction of the Youth Corrections Act.

[4] This case closely parallels Roberts v. United States, supra. After pleading guilty to a federal offense, Roberts was sentenced to pay a $250 fine and to serve two years in prison. Pursuant to authority under the federal probation statute, the District Court suspended execution of the sentence conditioned upon payment of the fine and ordered Roberts' release on probation for a 5-year period. Four years later, the court after a hearing revoked the probation, set aside the original sentence of two years, and imposed a new sentence of three years. The Court of Appeals affirmed. On petition for certiorari, Roberts argued that the probation statute did not authorize imposition of an increased sentence after revocation of a suspended original sentence and, if not so construed, the statute was unconstitutional. The Court granted certiorari and reversed on statutory grounds, not reaching the constitutional question.

"If the authority exists in federal courts to suspend or to increase a sen-

That rule requires a firm rejection of the argument that a second sentencing judge has power to convert an unexpired YCA sentence into an adult sentence. For there can be no question about the fact that an adult sentence is more severe than a YCA sentence.[5] Nor can we "assume Congress to have intended such a departure from well-established doctrine without a clear expression to disavow it." *Dorszynski* v. *United States*, 418 U. S. 424, 441. It is undisputed that the Youth Corrections Act contains no such clear expression of congressional intent. Indeed, the Court's opinion repeatedly confirms this proposition.[6] The Court's novel holding is

---

tence fixed by a valid judgment, it must be derived from the Probation Act. The government concedes that federal courts had no such power prior to passage of that Act. See *Ex parte United States*, 242 U. S. 27; *United States* v. *Mayer*, 235 U. S. 55; *Ex parte Lange*, 18 Wall. 163; *United States* v. *Benz*, 282 U. S. 304." 320 U. S., at 265–266.

The Court concluded that, despite language in the statute that "the court may revoke the probation or the suspension of sentence, and may impose any sentence which might originally have been imposed," the Probation Act did not authorize such an increased sentence. The Court held that "having exercised its discretion by sentencing an offender to a definite term of imprisonment in advance of probation, a court may not later upon revocation of probation set aside that sentence and increase the term of imprisonment." *Id.*, at 272–273.

Thus, *Roberts* recognizes the critical distinction between changing a sentence after it has been imposed and postponing imposition of a sentence. The Court today not only ignores this distinction, see *ante*, at 217–218, n. 10, 220–221, n. 14, but does not even cite *Roberts*.

[5] The Court does not deny that an adult sentence of a given number of years is more severe than a YCA sentence for the same number of years. As THE CHIEF JUSTICE, then a Circuit Judge, stated for the United States Court of Appeals for the District of Columbia Circuit, YCA "confinement cannot be equated with incarceration in an ordinary prison." *Carter* v. *United States*, 113 U. S. App. D. C. 123, 125, 306 F. 2d 283, 285 (1962). See *United States* v. *McDonald*, 611 F. 2d 1291, 1294–1295 (CA9 1980); *Rogers* v. *United States*, 326 F. 2d 56, 57 (CA10 1963); 18 U. S. C. § 5011; H. R. Rep. No. 2979, 81st Cong., 2d Sess., 3 (1950).

[6] The Court admits that "[n]o provision of the YCA explicitly governs the issue before us," *ante*, at 213; that "[t]he statute describes the sentenc-

supported by nothing more than inferences drawn from the "history and structure of the YCA." See *ante*, at 214. Manifestly, such inferences are insufficient to justify a judicial rewriting of what "has been accurately described as the most comprehensive federal statute concerned with sentencing." *Dorszynski, supra*, at 432.

The Court's first argument rests on the premise that Congress did not intend either that corrigible youth offenders be housed with incorrigible youth offenders or that futile YCA treatment be continued. The Court reasons that continued YCA treatment is in derogation of such congressional intent whenever a youth offender, while serving his YCA sentence, commits another crime sufficiently serious to convince the second sentencing judge that the youth will no longer benefit from YCA treatment. *Ante*, at 214–215. All of this may

___

ing options available to a judge after conviction but does not elucidate what options would be available after the defendant has been convicted of a second crime while serving his initial sentence," *ibid.;* that "§ 5010 (d) does not expressly authorize a second judge to make a 'no benefit' finding with respect to the remainder of an unexpired YCA sentence," *ibid.;* and that "the legislative history reveals no explicit discussion of the trial court's options in sentencing a youth who commits a crime while serving a YCA sentence; Congress apparently did not consider this specific problem," *ante*, at 214. Petitioner agrees:

"Nothing in the language of the YCA is specifically directed to the problem of an offender who, while serving a YCA sentence, commits a crime and receives a consecutive term of imprisonment as an adult, thus acquiring a dual status as both an adult offender and a YCA offender. The legislative history reveals that Congress, in its optimism about the new approach, did not consider or provide for the situation in which a youth offender would commit a serious crime while rehabilitation was underway." Brief for Petitioner 12–13.

Indeed, petitioner urges the Court to defer to the Bureau of Prisons' interpretation of the Youth Corrections Act, see Bureau of Prisons Policy Statement No. 5215.2 (Dec. 12, 1978), an argument the Court soundly rejects. *Ante*, at 212–213. I agree with the Court that the Bureau of Prisons does not have power under the Youth Corrections Act to terminate YCA treatment.

well be true, but it does not follow that the second sentencing judge may impose a consecutive adult sentence and also confine the offender as an adult under the unexpired YCA sentence. A much less drastic solution will accomplish the objectives ascribed to Congress. The second judge simply may impose a concurrent adult sentence and thereby end the offender's YCA treatment.[7] Moreover, even if, as in this case, the second sentencing judge imposes a consecutive rather than a concurrent sentence, prison officials nonetheless can effectuate these objectives by exercising their authority to terminate the YCA confinement and allow the consecutive adult sentence to commence. See 18 U. S. C. § 5017. It is therefore clear that the Court's premise does not support its conclusion that Congress must have intended that the second sentencing judge may modify the first sentence by increasing its severity.[8]

---

[7] Petitioner objects to that alternative solution because, with consecutive sentences, the judge can impose a harsher sentence. See Tr. of Oral Arg. 14–15, 48. I am confident, however, that the maximum sentences authorized for serious crimes (or even less serious crimes) are sufficiently high to satisfy this objection. Title 18 U. S. C. § 111, under which respondent in 1975 was convicted and sentenced to 5½ years' imprisonment, authorizes as a penalty a fine of not more than $10,000 or imprisonment of not more than 10 years, or both. Even if these statutory maximums were inadequate, as this Court stated in response to a youth offender's claim that his sentence was too harsh, "'the remedy must be afforded by act of Congress, not by judicial legislation under the guise of construction,' [*Blockburger* v. *United States*, 284 U. S. 299, 305], since '[w]hatever views may be entertained regarding severity of punishment . . . [t]hese are peculiarly questions of legislative policy.' [*Gore* v. *United States*, 357 U. S. 386, 393]." *Dorszynski* v. *United States*, 418 U. S. 424, 442.

[8] Indeed, the Court concedes the practicality point:

"We see no relevant difference in the fact that concurrent sentences traditionally take effect immediately. As we hold today, a judge imposing a *consecutive* adult sentence may find that continued YCA treatment during the unexpired term would be futile, and his finding may take effect immediately. In either case, the YCA permits a judge to effectuate his finding with respect to whether future YCA treatment would be beneficial. Of

The Court's second argument is no better. The Court notes that, "in several circumstances, the YCA permits a youth offender initially sentenced under the YCA to be treated as an adult for what would otherwise be the remainder of the YCA sentence." *Ante,* at 215. The Court's examples are set forth in the margin.[9] I do not disagree with the Court that the imposition of a YCA sentence does not entitle an offender to YCA treatment for the full length of that sentence no matter what crimes he commits in the interim, or that respondent could have been subjected to immediate adult confinement in each of the Court's examples. I do not agree, however, that a second judge may impose adult treatment on an offender who continues to be incarcerated not on the basis of a subsequent adult sentence but on the basis of the original YCA sentence. None of the Court's examples

course, a concurrent sentence of a given length will result in a shorter ultimate sentence than a consecutive sentence of that length; but a judge wishing to impose a longer ultimate sentence may simply increase the length of the concurrent sentence accordingly." *Ante,* at 216–217, n. 9 (emphasis in original).

[9] "For example, the statute permits a court to sentence a defendant to an adult term if he commits an adult offense after receiving a suspended sentence and probation under § 5010(a). If respondent had been sentenced initially to probation under § 5010(a) and had been subsequently convicted of criminal assault, the court could have imposed an adult sentence for the original crime, for the assault, or for both, to begin immediately. . . .

"Moreover, respondent concedes that the statute permits a judge to impose a *concurrent* adult sentence on an offender who is serving a YCA term. Such an adult sentence would commence at the time that it was imposed and would modify the YCA treatment that the offender would otherwise receive for the remainder of his term. Finally, every offender sentenced under the YCA *must* be released conditionally two years prior to the termination of his sentence. 18 U. S. C. § 5017. However, if the offender violates the terms of this conditional release by committing a crime, the conditional release may be revoked and an adult sentence may immediately be imposed, notwithstanding the fact that the youth sentence has not yet expired." *Ante,* at 215–217 (footnotes omitted and emphasis in original).

poses that situation; hence there is no reason to suppose that Congress intended that any authority, even a court, may increase the severity of a sentence after that sentence has become final. In fact, as the Court points out in a footnote, the only statutory authorization for a judicial modification of a YCA sentence permits "a judge [to] *reduce* the severity of the terms of commitment in light of changed circumstances." *Ante*, at 215, n. 7 (emphasis in original); see 18 U. S. C. §§ 5021, 5023.

There is, therefore, nothing in the text, history, or structure of the Youth Corrections Act that supports the Court's holding that a judge may increase the severity of a YCA sentence after it has become final.[10] Even apart from the constitutional problem with such a holding, see n. 3, *supra*, this absence of statutory support is fatal.[11] Not only did Con-

---

[10] Writing for the Court of Appeals, Judge Swygert made the point in this way:

"The Warden asks us to read into this Act which has as its ultimate purpose rehabilitation, a highly unusual sentencing option that would permit one judge to reevaluate another judge's YCA sentence and impose in its place a traditional adult sentence. There is 'not a word' in the statute or its legislative history 'about augmenting sentences or about having a second judge in any way change them.' *[Thompson* v. *Carlson,]* 624 F. 2d 415, 426 (3d Cir. 1980) (Adams, J., dissenting). Such a reading is contrary to the letter and the spirit of the act, and the cited provisions do not convince us otherwise." 642 F. 2d 1077, 1081 (CA7 1981).

[11] The Court asserts that the common-law rule that a sentence may not be increased after it has become final "simply does not apply when Congress has provided a court with the power to modify a sentence in light of changed circumstances. . . . Here, the statute permits a judge to modify the conditions of a YCA sentence if the offender is convicted of a subsequent adult crime and if further YCA treatment would be futile." *Ante*, at 218, n. 10. Of course, whether Congress expressed an intent to depart from the common-law rule is the critical question. The Court and petitioner concede that neither the statute nor the legislative history evinces such an intent because Congress did not contemplate the situation. See n. 6, *supra*. Nor do the Court's historical and structural arguments support the result the Court reaches. See discussion *supra*, at 226–228 and this page. The Court simply imposes the result it thinks makes the most

gress not intend the result reached by the Court today, there is good reason to believe that Congress intended just the opposite.

In enacting the Youth Corrections Act, Congress recognized that a YCA sentence of a given number of years is qualitatively less severe than an adult sentence of equal length.[12] Indeed, § 5010(b) authorizes a district court to impose a longer YCA sentence (up to six years) than would be authorized if the offender were sentenced as an adult. The federal courts unanimously have upheld § 5010(b) against constitutional challenges on the reasoning early expressed by THE CHIEF JUSTICE when a Circuit Judge and often quoted thereafter:

> "[T]he basic theory of that Act is rehabilitative and in a sense this rehabilitation may be regarded as comprising the *quid pro quo* for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison. . . . [T]he Youth Corrections Act 'provides for and affords youthful offenders, in the discretion of the judge, not heavier penalties and punishment than are imposed upon adult offenders, but the opportunity to escape from the physical and psychological shocks and traumas attendant upon serving an ordinary penal sentence while obtaining the benefits of corrective treatment, looking to rehabilitation and social redemption and restoration.'" *Carter* v. *United States*, 113 U. S. App. D. C. 123, 125, 306 F. 2d 283, 285 (1962) (quoting *Cunningham* v. *United States*, 256 F. 2d 467, 472 (CA5 1958)).[13]

---

sense. While such interstitial lawmaking may be appropriate in some circumstances, it surely is not warranted when the Court is bound to follow the common-law rule absent *affirmative* evidence that Congress intended to depart from that rule.

[12] See n. 5, *supra*.

[13] Accord, *e. g.*, *Abernathy* v. *United States*, 418 F. 2d 288, 290 (CA5 1969); *Johnson* v. *United States*, 374 F. 2d 966, 967 (CA4 1967); *Brisco* v. *United States*, 368 F. 2d 214, 215 (CA3 1966); *Kotz* v. *United States*, 353 F.

It is of no consequence that respondent was sentenced not under §5010(b), but under §5010(c), for the same *quid pro quo* theory that justifies longer YCA terms than maximum adult terms for a given offense also justifies YCA terms within the statutory adult maximum but longer than an adult would generally receive. See *Watts* v. *Hadden,* 651 F. 2d 1354, 1365 (CA10 1981); *United States ex rel. Dancy* v. *Arnold,* 572 F. 2d 107, 111 (CA3 1978). It is no coincidence that the Youth Corrections Act vests broad authority in the district judge to impose lengthy YCA sentences and also vests broad authority in prison officials to order early releases of youth offenders from their YCA sentences.[14] The proponents of the Youth Corrections Act repeatedly emphasized that prison officials must be given sufficient time to rehabilitate youth offenders and sufficient authority to release rehabilitated offenders from their custodial sentences.[15] As the then Director of the Bureau of Prisons explained before the Senate Subcommittee studying the proposed Youth Corrections Act in 1949, the imposition of ordinary adult-length sentences on youth offenders was completely unrelated to the

---

2d 312, 314 (CA8 1965); *Eller* v. *United States,* 327 F. 2d 639 (CA9 1964); *Rogers* v. *United States,* 326 F. 2d 56, 56–57 (CA10 1963). Cf. *United States ex rel. Sero* v. *Preiser,* 506 F. 2d 1115, 1123–1124 (CA2 1974) (New York law), cert. denied, 421 U. S. 921; *United States ex rel. Wilson* v. *Coughlin,* 472 F. 2d 100, 102–103 (CA7 1973) (Illinois law).

[14] See 18 U. S. C. §§ 5010, 5017.

[15] See, *e. g.,* Correctional System for Youthful Offenders: Hearings on S. 1114 and S. 2609 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st Sess., 22, 24, 27 (statement of James V. Bennett, Director, Bureau of Prisons), 33 (statement of Curtis Shears, Chairman, Youth Participation Committee, D. C. Department of American Legion), 53–55 (statement of Carroll Hincks, U. S. District Judge), 62, 66 (statement of Orie L. Phillips, U. S. Circuit Judge) (1949); Federal Corrections Act and Improvement in Parole: Hearings on H. R. 2139 and H. R. 2140 before Subcommittee No. 3 of the House Committee on the Judiciary, 78th Cong., 1st Sess., 74–75 (extension of statement of Carroll C. Hincks), 138–139 (Reference Notes on Federal Corrections Act, submitted by James V. Bennett) (1943).

rehabilitative effort; the sentences were either far too long or far too short.[16]    The promises of treatment and of early release justified the imposition of longer YCA sentences.

If a second sentencing judge is able to convert an unexpired YCA sentence into an adult sentence, the *quid pro quo* vanishes.    The youth offender who is sentenced to a longer term of confinement when sentenced under the YCA than if he were sentenced as an adult may end up, as respondent will under the Court's holding, serving that lengthier sentence under the adult conditions he paid a price to avoid. Furthermore, he is not entitled for the duration of that sentence to the good-time allowances available to offenders sentenced as adults.[17]    The humanitarian objectives of

---

[16] "From the hundreds of cases of this type which have come across my desk I have formed the conclusion that in the task of correcting the offender the crucial element is that of time.    Attitudes, habits, interests, standards cannot be changed overnight.    Training in work habits and skills requires time.    Once the individual has received the maximum benefit from the institutional program, however, it is just as important that his release to the community be effected promptly.    In the case of each person confined there comes a period when he has his best prospects of making good in the community.    His release should occur at that time.    If he is released earlier he will not be ready for the task of establishing himself; if later, he may have become bitter, unsure of himself, or jittery like the athlete who is overtrained.

"Rarely does a day go by in one of our institutions for younger offenders without a youth being received whose sentence is either far too long or far too short, if the institution is to carry out its objective of correctional treatment.

"I have seen thousands of men rightly sent to prison but wrongly for periods so short that their imprisonment was only an expense to the Government and accomplished little so far as the rehabilitation of the man or the protection of the community was concerned.    I have seen men sent to prison for so long that all efforts in their behalf were frustrated."    Hearings on S. 1114 and S. 2609, *supra* n. 15, at 27 (statement of James V. Bennett).

[17] See *Staudmier* v. *United States,* 496 F. 2d 1191, 1192 (CA10 1974); *Hale* v. *United States,* 307 F. Supp. 345, 346 (WD Okla. 1970); *Foote* v. *United States,* 306 F. Supp. 627, 628–629 (Nev. 1969).

the Youth Corrections Act do not justify fundamental unfairness.[18]

If the original sentencing judge had known that a subsequent adult sentence could result in expiration of YCA treatment but not of the YCA sentence, he might well have discounted the length of the YCA sentence to reflect this possibility.[19] Moreover, if respondent had known of this possibility, he might have elected to stand trial rather than to plead guilty.[20] Speculation of this kind[21] would be unnecessary if the Court declined to enlarge upon the statute that Congress has written. If an amendment to the statute is needed to deal with a problem that Congress did not foresee, it is Congress—not this Court—that must perform that task.

I do not purport to know whether YCA treatment is effective for youthful offenders in general, or would serve any

---

[18] I had thought that Justice Fortas, writing so eloquently for the Court in *In re Gault*, 387 U. S. 1, 12–31, with specific reference to the juvenile justice system, had settled that point.

[19] Bureau of Prisons Policy Statement No. 5215.2 (Dec. 12, 1978), which purports to exclude from YCA treatment YCA-sentenced offenders who are also sentenced to a concurrent or consecutive adult term, was promulgated four and one-half years after respondent was sentenced under the Youth Corrections Act.

[20] Respondent pleaded guilty to the offense for which he was sentenced to 10 years' confinement under the Youth Corrections Act. *Ante*, at 203. For challenges against such guilty pleas on the ground that the defendant was not fully apprised of the consequences of being sentenced under the Youth Corrections Act, see, *e. g., Marvel* v. *United States*, 380 U. S. 262; *Caldwell* v. *United States*, 435 F. 2d 1079 (CA10 1970); *James* v. *United States*, 388 F. 2d 453 (CA5 1968); *Freeman* v. *United States*, 350 F. 2d 940 (CA9 1965); *Chapin* v. *United States*, 341 F. 2d 900 (CA10 1965); *Pilkington* v. *United States*, 315 F. 2d 204 (CA4 1963); *Carter* v. *United States*, 113 U. S. App. D. C. 123, 306 F. 2d 283 (1962).

[21] Indeed, the Court of Appeals suggested that even the second and third sentencing judges might have imposed different sentences had they known that a no-benefit finding would take .effect immediately rather than when the consecutive adult sentence commenced. See 642 F. 2d, at 1082; see also *ante*, at 219 (noting the "interpretive difficulties" of the subsequent sentencing judges' intent with respect to treatment during the remainder of the YCA term).

useful purpose for this particular offender.[22]   No such question is relevant to the legal issue raised by this case.   The only question presented is whether a federal judge confronted with the task of sentencing an inmate for an offense committed while he is serving a sentence for an earlier crime may not only impose the punishment authorized by law for the later offense but may also take it upon himself to enhance the earlier sentence as well.   The answer to that question seems so obvious to me that I shall not further belabor it.

I respectfully dissent.

---

[22] In his concurring opinion in the Court of Appeals, Judge Pell succinctly put these considerations to one side:

"While I see, on this record, no indication to think that either Robinson or society will benefit by continuing the YCA treatment, Congress, by the statute applicable in this case, has mandated the continuance."   642 F. 2d, at 1083.