Reginald D. STAMPS–BEY, Plaintiff,

v.

Dale THOMAS, Warden;  Leonard W. Graves, Associate Warden;  W. Stephen Harmison, Unit Manager;  John Sanders, Unit Counselor, Defendants.

No. 83 Civ. 1220 (RWS).

United States District Court,
S.D. New York.

Sept. 20, 1985.

John P. Cooney, Jr., George B. Newhouse, Jr. and Felicia A. Mennin, New York City, for plaintiff.

Rudolph W. Giuliani, U.S. Atty. for Southern Dist. of New York, New York City (Robert W. Gaffry, Asst. U.S. Atty., New York City, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Defendants Dale Thomas ("Thomas"), Leonard W. Graves ("Graves"), W. Stephen Harrison ("Harrison") and John Sanders ("Sanders"), officials at the Metropolitan Correctional Center ("MCC") in New York, have moved pursuant to Fed.R.Civ.P. 12(b)(6) and 56 for an order dismissing the amended complaint of plaintiff Reginald D. Stamps-Bey ("Stamps-Bey") for failure to state a claim upon which relief can be granted or, in the alternative, for summary judgment. Stamps-Bey has cross-moved for partial summary judgment. Stamps-Bey's motion is denied and the defendants' motion for summary judgment is granted.

**Facts**

Stamps-Bey was sentenced on September 27, 1978 in Superior Court for the District of Columbia to an indeterminate term of ten years under § 5015(c) of the Youth Corrections Act, 18 U.S.C. §§ 5005–5017, repealed, Pub.L. 98–473, Title II, § 218(a)(8), 98 Stat. 2027, effective October 12, 1984 ("YCA"), for assault with intent to commit armed robbery. From February 1, 1982 until December 27, 1982, Stamps-Bey was incarcerated at the Federal Correctional Institution, Petersburg, Virginia ("FCI Petersburg"), which had been designated as the most secure of the All-Youth Corrections Act facilities. From May 23, 1982 to December 27, 1982 as a consequence of misconduct Stamps-Bey was held in FCI Petersburg's disciplinary segregation unit. Because of Stamps-Bey's alleged involvement in various disruptive incidents while at FCI Petersburg, the warden of FCI Petersburg had requested authorization from the Bureau of Prisons to remove Stamps-Bey from the YCA program. In November of 1982 the Bureau of Prisons applied to the Washington, D.C. Superior Court Judge who had sentenced Stamps-Bey for a "no further benefit" ruling which would have allowed his removal from the YCA program and his placement in a non-YCA facility.

On December 25, 1982 a major disturbance took place at the FCI Petersburg resulting in a fatality. Because of the numbers of inmates involved, the Special Housing unit capacity of FCI Petersburg's disciplinary segregation unit was exceeded by the numbers of inmates to be held in administrative detention. This emergency condition required the transfer of Stamps-Bey and approximately twenty other YCA inmates from FCI Petersburg's disciplinary segregation unit (the "YCA inmates") to the MCC in New York. These inmates were considered to require a higher level of security than could be provided in other YCA facilities. The delegated authority to transfer the inmates was exercised by Z. Stephen Grzegorek, Regional Director, Northeast Region of the Bureau of Prisons ("Grzegorek"), who "in conjunction with others in the Bureau of Prions, determined that the best alternative would be to send inmate Stamps Bey and the others to the MCC, N.Y.", (Grzegorek Affidavit, ¶ 9), a determination that was accomplished on December 27, 1982. While at the MCC, the YCA inmates were placed in a separate

wing in the administrative detention area. On January 4, 1983 Associate Warden Graves of the MCC, issued a memorandum (the "Graves Memorandum") attached hereto as Appendix A, subsequently approved by Warden Thomas setting forth the conditions of confinement for the YCA inmates at the MCC.

According to this record, Thomas and his subordinates had no authority to transfer Stamps-Bey or to assign him to another institution, a power exercised elsewhere in the Bureau of Prisons. Thomas and the remaining defendants were responsible for the treatment accorded Stamps-Bey while at the MCC in what Thomas believed to be an emergency status.

In February of 1983 all of the YCA inmates except Stamps-Bey were returned to FCI Petersburg. Stamps-Bey was kept at the MCC pending a ruling on his status as a YCA inmate, the Superior Court not having yet ruled on the application by the Bureau. According to Grzegorek, Stamps-Bey was not returned to FCI Petersburg while the Bureau of Prisons awaited the Judge's decision "because of his extremely disruptive background." (Grzegorek Affidavit ¶ 11).

On January 25, 1983 Stamps-Bey filed a petition for habeas relief with this court, challenging certain conditions of his confinement at the MCC. In particular, he alleged that he was restricted from getting exercise, attending religious services, and using the prison law library, and challenged his segregation from other prisoners. This court treated Stamps-Bey's petition as a motion for preliminary injunction which was denied in an opinion dated February 18, 1983 on the grounds that his segregation was not "impractical" under the YCA and that his other complaints did not rise to the level of constitutional violations. The habeas corpus petition was dismissed on April 8, 1983 following the government's representation that Stamps-Bey would shortly be transferred back to FCI Petersburg. Stamps-Bey was returned to FCI Petersburg on April 15, 1983.

Stamps-Bey filed his first complaint in this action on February 16, 1983, seeking injunctive relief and money damages from defendants Thomas and Graves for various restrictions placed on him at the MCC, in particular, the denial of visits with his common-law wife, Christine Bethea ("Bethea") and others and the denial of access to the law library, paper and typewriters. In an opinion dated October 19, 1983, this court granted the defendants' motion to dismiss for failure to state a claim and for summary judgment, holding that the restrictions did not violate his constitutional rights. However, the opinion left open the question whether a "lack of treatment" under the YCA stated a constitutional claim against the defendants. The parties were directed to brief the issue, and counsel was appointed for Stamps-Bey.

On October 2, 1984 an amended complaint was filed in lieu of a briefing of the treatment issue. In the amended complaint, which added two defendants, Harrison, Unit Manager at MCC and Sanders, Unit Counselor at MCC, Stamps-Bey claimed that Sanders and Harrison denied him access to religious and psychological counselling, reading materials, educational opportunities, and visits from family members. In addition, he alleges that he was held in "solitary confinement" for four months and that he was not allowed to socialize or congregate with an alleged group of YCA inmates. As to Thomas and Graves, he alleges that the procedures implemented in the Graves' memorandum were violative of the YCA and his constitutional rights.

**Discussion**

In their motion to dismiss or in the alternative for summary judgment, the defendants contend that they are immune from liability under either the qualified immunity doctrine of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) or in the alternative on the grounds that the acts which they are alleged to have committed were committed in the course of their official duties and did not rise to the level of constitutional violations. In re-

sponse, Stamps-Bey contests the assertions of immunity and asserts that he is entitled to partial summary judgment on his claim that the defendants' deliberate disregard of the treatment mandate of the YCA constitutes a violation of his constitutional rights.

In the amended complaint, Stamps-Bey delineates numerous acts on the part of the defendants which he contends constitute violations of his constitutional rights. The crux of his complaint, however, is his allegation that he is entitled to relief for the alleged deprivation of his right to treatment and rehabilitation under the YCA, which provides that YCA inmates "shall undergo treatment" and insofar as practical "shall be segregated according to their needs" for such treatment. 18 U.S.C. § 5011. The Third Circuit has convincingly held that this language creates a legitimate expectation or right that rises to the level of a liberty interest protectible under the due process clause and enforceable through an action for damages. *Micklus v. Carlson*, 632 F.2d 227, 237–39 (3d Cir. 1980). Despite the defendants' attempt to distinguish *Micklus* as addressing only the segregation aspect of the YCA, Stamps-Bey's allegation that the defendants deprived him of treatment under the YCA states a cognizable claim under the Fifth Amendment.

However, even if Stamps-Bey's claim under the YCA is of constitutional stature, the defendants urge that they are protected by the doctrine of qualified immunity. The liability of a government official for claims arising under the Constitution has been sharply curtailed by the Supreme Court. In *Harlow v. Fitzgerald, supra,* the Court reformulated the doctrine of qualified immunity by establishing an objective standard against which to measure the actions of a federal official accused of constitutional torts. As noted in the October 19, 1983 opinion, prior to *Harlow,* government officials were entitled to qualified immunity from such claims only upon a showing of a subjective good faith belief in the legality of their actions, a standard that often permitted insubstantial

claims to proceed to trial. *See, e.g., Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974). Recognizing that the benefits of a remedy for the vindication of constitutional guarantees may be significantly counterbalanced by the social costs of allowing non-meritorious claims to proceed to trial, the Court in *Harlow* excluded the subjective element of the defense in order to "avoid excessive disruption of government and permit the resolution of many insubstantial claims or summary judgment." 457 U.S. at 817, 102 S.Ct. at 2737–38. The Court held that:

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 817–18, 102 S.Ct. at 2737–38. Under the holding of *Harlow,* a government official's immunity from liability depends on the objective reasonableness of his conduct as measured by reference to clearly established law. In order to resolve the question of the defendants' immunity from liability, the issue of what the applicable law was at the time of the occurrences, and the degree to which it was settled, must first be determined.

The YCA was enacted in 1950 in order to provide an effective method of rehabilitating youths convicted in federal courts. The intent of the YCA was to substitute rehabilitative treatment for retribution as a sentencing goal. *Caballery v. US Parole Commission,* 673 F.2d 43, 45 (2d Cir.1982). The Act conferred special benefits such as evaluation, treatments and review on the YCA offender and at the same time imposed additional burdens in the form of indeterminate, and often longer sentences. Treatment is defined as "corrective and preventive guidance and training designed to protect the public by correcting the anti-

social tendencies of youth offenders." 18 U.S.C. § 5006(g).

Section 5011 of the Act provides:

Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment.

18 U.S.C. § 5011. The requirement of segregation is an essential element of the YCA. In *Watts v. Hadden*, 651 F.2d 1354 (10th Cir.), *reh. denied*, 686 F.2d 841 (1981), the Tenth Circuit invalidated the prior Bureau of Prisons program allowing for the housing of some YCA inmates at non-YCA institutions, and held that "the YCA requires the Bureau of Prisons to establish complete segregation of youth offenders from other offenders as the norm." 651 F.2d at 1366. In response, the Bureau of Prisons established new regulations for the treatment of YCA offenders which provided for the establishment of "all YCA institutions" and the development of an individualized treatment program for each YCA inmate. 28 CFR § 524.20–30; Federal Bureau of Prison Program Statement No. 5215.3, July 13, 1982 ("Program Statement").

■ Neither the Act nor the regulations authorize Bureau officials or employees to remove YCA status from an individual, *Ralston v. Robinson*, 454 U.S. 201, 213, 102 S.Ct. 233, 241–42, 70 L.Ed.2d 345 (1981), *cert. denied*, 455 U.S. 929, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *Micklus v.*

*Carlson, supra*, and a YCA inmate may only be removed from the program upon receipt of a judicial "no benefit" ruling from the sentencing judge. *See King v. Kenney*, 671 F.2d 1053, 1055 (7th Cir.1982). However, the Act does empower the Director of the Bureau of Prisons to transfer a youth offender from one institution to another. 18 U.S.C. § 5015(b). The regulations implementing this section provide in pertinent part that:

A YCA inmate may be considered for transfer to a non-YCA setting under the following conditions:

\*    \*    \*    \*    \*    \*

(d) A YCA inmate may be confined temporarily in a non-YCA setting on "holdover" status (en route to another institution). The YCA inmate who is confined temporarily on "holdover" status is to be physically separated from non-YCA inmates.

(e) A YCA inmate, upon approval of the Director, Bureau of Prisons, may be confined in a non-YCA setting for other compelling reasons.

28 CFR 524.30. The Program Statement setting forth Bureau policy and rules applicable to all YCA inmates provides that:

(a)pproval of the Assistant Director, Correction Programs Division is required for a YCA inmate on "holdover" status to be housed in any non-YCA setting over 30 days. Approval of the Director, Bureau of Prisons' is required for a YCA inmate on "holdover" status to be housed in any non-YCA setting over 60 days.

Program statement at 14.

■ The issue of the degree of treatment under the YCA which must be accorded YCA inmates temporarily confined to a non-YCA institution is apparently one of first impression. Although the Warden of a YCA institution is plainly obligated to provide treatment in accordance with the YCA to a YCA inmate confined to that institution, even if the YCA inmate is in administrative detention, *see Johnson v. Rodgers*, 756 F.2d 79 (10th Cir.1985); *see also Dorszynski v. United States*, 418 U.S.

424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974), the Regulations appear to assume that all treatment will be provided in YCA institutions and were directed only towards Wardens at YCA institutions. The only Regulation directly pertaining to non-YCA institutions is 28 CFR 524.30(d), which requires that a YCA inmate confined in a non-YCA setting on "holdover" status must be physically segregated from non-YCA inmates. In addition, although the YCA affirmatively mandates treatment to all YCA offenders, neither the YCA nor the Regulations specifically address the question of the manner in which that obligation must continue to be fulfilled at those times during which a YCA inmate is temporarily placed in a non-YCA institution as a holdover or on an emergency basis. There is no specific indication as to the amount of treatment a YCA inmate in a non-YCA setting should receive or the amount of time during which a YCA inmate could properly go without any treatment, nor is there any indication as to who should bear the burden of ensuring that YCA inmates held in a non-YCA institution receive treatment.

■ The general issue of the right to treatment of temporarily placed YCA inmates, however, need not be addressed because this case presents only the more narrow issue of the objective reasonableness, when measured against settled law, of the alleged failure of these particular defendants to provide such treatment. In light of the applicable regulations and guidelines, the defendants' conduct was reasonable. Given that the one regulation specifically pertaining to YCA inmates at non-YCA institutions makes reference only to segregation and not treatment, a conclusion that the Warden at a non-YCA institution had no obligation to provide treatment during the temporary confinement of the YCA inmates, whether as holdovers or not, is not unreasonable. Even though the defendants may be charged with the knowledge that the YCA requires that all YCA inmates receive treatment, in light of the Regulations they need not be charged with an understanding that this requirement carries over to all situations at all times.

In choosing to segregate Stamps-Bey from all MCC inmates and to provide him with allegedly limited treatment, the defendants acted reasonably in light of existing law and thus are immune from liability for any failure of Stamps-Bey to receive treatment while at the MCC.

This conclusion is not altered by the possibility that Stamps-Bey may have been confined at the MCC in violation of the Bureau of Prison regulations quoted above. Although it appears that given the emergency situation at FCI Petersburg, Stamps-Bey could legitimately have been transferred to the MCC in accordance with 28 C.F.R. 524.30(e), which permits the transfer of a YCA inmate to a non-YCA setting for "compelling reasons" upon approval of the Director, Bureau of Prisons, the record does not establish whether the transfer was conceived to be under § 524.30(b) or whether the Director's approval was sought or obtained. From the affidavit of Grzegorek it could be concluded that the Bureau chose to classify Stamps-Bey as a holdover under 28 C.F.R. 524.30(d). However, § 524.30(d) specifically defines a YCA inmate on holdover status as one "en route to another institution". The designation process has not been described in this record, nor has any documentation been supplied with respect to it. Even if Stamps-Bey did qualify as a holdover initially, the record does not establish whether the Bureau of Prisons followed the requirements set out in the Program Statement for obtaining approval in order to keep a YCA inmate on holdover status for more than thirty days.

However, whether Stamps-Bey was legitimately placed at the MCC as a holdover or at some point no longer had holdover status, the obligation of the defendants to provide him with treatment is not altered. Stamps-Bey contends that as the officers charged with responsibility for enforcing the law pertaining to prisoners incarcerated at the MCC, the defendants had the obligation to recognize that Stamps-Bey's confinement at the MCC was not in accordance with Bureau of Prison regulations and

thus to treat him as a YCA inmate rather than a holdover inmate. However, the law pertaining to the obligations of officials at non-YCA institutions to provide treatment had not been developed, and at the time of the decisions giving rise to this case, and perhaps even today, was far from clear. It was not unreasonable for the defendants to look to the law pertaining to holdovers for guidance as to the manner in which to treat Stamps-Bey, even if he were determined to be inappropriately classified as a holdover. Because the defendants had no authority over Stamps-Bey's placement within the prison system, they cannot be held accountable for violations arising from his transfer from FCI Petersburg, a YCA facility. Their only responsibility lay in the treatment accorded Stamps-Bey while confined at MCC, and as noted above, the manner in which they provided him with treatment was not unreasonable in light of the existing regulations.

The conclusion that these defendants acted reasonably in light of their situation and the existing regulations in denying Stamps-Bey YCA treatment does not necessarily imply any further conclusion that the Bureau acted reasonably, or otherwise, in the initial or continued assignment of Stamps-Bey to the MCC. In the present case, however, Stamps-Bey has chosen to complain against the MCC officials and that complaint will be dismissed for the reasons stated.

█ In addition to charging the defendants with violating Stamps-Bey's constitutional rights by depriving him of treatment under the YCA, the amended complaint also stated a claim under the due process clause for the wrongful administrative detention of Stamps-Bey without a hearing and in violation of Bureau of Prison regulations. As noted above, Stamps-Bey has failed to show that the defendants have any responsibility for Stamps-Bey's placement within the prison system in general. As to his placement in administrative detention within the MCC, the decision to place him in administrative detention has just been declared reasonable for the rea-

sons stated. Stamps-Bey also contends that the defendants violated the appropriate procedures as to administration detention. 28 C.F.R. § 541.22(d) prescribed "Conditions of Administrative Detention" and provided in part:

> If consistent with available resources and the security needs of the unit, the Warden shall give an inmate housed in administrative detention the same general privileges given to inmates in the general population. This includes, but is not limited to, providing an inmate with the opportunity for participation in an education program, library services, social services, counseling, religious guidance and recreation.

Stamps-Bey contends that he was not afforded any of these privileges and that the defendants' failure to comply with their own regulations represents a constitutional violation.

However, the record reveals that he received the benefit of the defendants' interpretation of their obligations under the YCA, an interpretation expressed in the Graves' memorandum. For the reasons already stated, the measures outlined in the Graves' memorandum and Stamps-Bey's subsequent treatment do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, supra*. This same reasoning is equally applicable to Stamps-Bey's claim that he was denied access to religious counseling by a member of his faith in violation of his First Amendment rights. Given the unusual circumstances with which the defendants were confronted, the defendants' manner of dealing with Stamps-Bey, as evidenced by the Graves Memorandum, was a reasonable response.

For the reasons discussed above, the defendants' motion for summary judgment is granted and the case will be dismissed in its entirety.

IT IS SO ORDERED.

## APPENDIX A

DATE: January 4, 1982

REPLY TO: L. Graves, Associate Warden (Program)

ATT OF:

SUBJECT: YCA Holdovers—9 North

TO: All Concerned

The following revised procedures will be implemented immediately and will remain in effect until further notice:

STAFFING: A Special Unit Officer will be assigned to 9 North during day and evening watches, in addition to regular Unit Officer coverage. This officer will be stationed on E and F range and will be responsible for supervision of this group of inmates. This officer will shower, recreate and feed this group.

SEPARATION: These inmates, as YCA's, are to have no contact with other inmates. Whenever moving into or out of the Unit, the entire Unit will be locked down.

RECREATION: Roof recreation is authorized. Inmates will be taken to the roof by the Special Unit Officer during the morning hours, 7 days a week. No more than 16 inmates will be allowed on the roof at one time. Each recreation period shall be 1 hour in length.

FEEDING: This group will receive their meals in their cells, prior to the feeding of the rest of the Unit. One Food Service staff member will assist the Special Unit Officer in preparation and distribution of these meals. NO INMATES will be utilized in preparation of these meals in the Unit.

CLOTHING EXCHANGE: Each Tuesday and Friday the Clothing Room Officer will make a clothing exchange including, jumpsuits, underwear, socks, sheets, and towels for these inmates. (Weeks 1 and 3 of Month—Monday/Thursday).

LAW LIBRARY: Use of law library materials shall be at the request of the inmate by "copout" to the Education Supervisor, describing the materials needed. Materials shall then be delivered in a timely fashion to the inmate by the Education Department.

GENERAL READING MATERIAL: The Education Department will, each Monday and Thursday, provide for book exchange on a one for one basis, of up to two books for each of these inmates. Each inmate will be allowed to possess up to 4 books at any time.

SHOWERS: Each inmate will be offered a daily shower between the hours of 8:00 a.m. and 4:00 p.m. The Special Unit Officer shall be responsible for scheduling and supervision.

VISITING: This group of inmates will be allowed visits from 5:30 p.m. to 8:30 p.m. on Monday, Thursday and Saturday. A special Visiting Officer will be assigned, and visits will take place in the 9 North Visiting Room. Visiting will be limited to immediate family and other visitors on approved visiting lists. Unit Team shall prepare a list of approved visitors for each of these inmates, a copy of which shall be maintained in the Lobby, 9 North Visiting Room, Unit Team Office, and Central File. Approval of non-family visitors may require submission of a written request from the inmate and appropriate investigation of the proposed visitor.

CORRESPONDENCE: Regular correspondence privileges will be permitted. Each inmate will receive 3 free stamps per week from the Unit Team.

MEDICAL SERVICES: A Physician's assistant will see each inmate in this group daily, will advise each of his presence, and of the availability of medical services should the inmate desire such services.

RELIGIOUS SERVICES: The institution Chaplain shall visit each of these inmates at least twice weekly, shall provide religious materials, and shall provide individual religious counseling. Congregate services for this group shall not be authorized.

DOCUMENTATION: A special Housing Unit Record Form, Form BP–IS–IIT shall be maintained by the Special Unit Officer for each inmate in this group. These records shall be reviewed each shift by the Shift Lieutenant and daily by the Unit Manager.

Any questions regarding these procedures, or other matters involving these inmates should be directed to the Unit Manager.